Doctors Council et al., Appellants-Respondents, v New York City Employees' Retirement System et al., Respondents-Appellants.

First Department, May 5, 1987

## APPEARANCES OF COUNSEL

*Richard M. Betheil* of counsel *(Ronald H. Shechtman* with him on the brief; *Pryor, Cashman, Sherman & Flynn,* attorneys), for appellants-respondents.

*Carolyn A. Reed* of counsel *(Fay Leoussis* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondents-appellants.

*Joel Giller* of counsel *(Beverly Gross* attorney), for Victor Gotbaum, as Executive Director of District Council 37, Ameri-

can Federation of State, County and Municipal Employees, *amicus curiae.*

**OPINION OF THE COURT**

SULLIVAN, J.

Plaintiffs, seven part-time doctors employed by the City of New York or the New York City Health and Hospitals Corporation (HHC), joined by their collective bargaining representative, Doctors Council, have brought this action seeking, *inter alia,* a declaration that they are entitled to membership in the New York City Employees' Retirement System (NYCERS). Defendants, NYCERS and the chairman of its board of trustees and its Executive Director seek a declaration also that membership is limited to employees in full-time city service. Both sides moved for summary judgment on the issue.

Doctors employed by either the city or HHC fall into two basic categories for payroll purposes—per annum doctors, who are paid according to an annual salary rate; and sessional doctors, paid at an hourly rate. Both are permanent city or HHC employees with regularly scheduled hours of work. Although the common understanding is different, a doctor whose compensation is fixed at a per annum basis is not necessarily a full-time employee, that is, one who, according to NYCERS, works at least 35 hours per week. Both sessional and per annum doctors may be employed either full time or part time. Of the 1,900 doctors employed by the city and HHC and represented by Doctors Council, approximately 1,300 are employed for less than 35 hours per week.

All per annum and most sessional doctors have full tenure protection under section 75 of the Civil Service Law or the Doctors Council collective bargaining agreement with the City of New York and HHC. Both part-time per annum and sessional doctors enjoy full collective bargaining rights. They are subject to the same discipline and the same accountability as to hours and performance, including sign-in procedures, as are doctors employed in full-time per annum positions.

In January of 1981, the Executive Director of NYCERS, one of the largest retirement systems in the country, with approximately 184,000 active members and 94,000 retirees as of June 30, 1984, and an annual pension payroll of approximately $619,000,000, notified its board of trustees that some part-time employees, primarily doctors and dentists, had been accepted as members. After reviewing the recommendations of a sub-

committee which had been established to study the issue, the board subsequently passed a resolution, dated November 6, 1981, stating that it "does not have the power * * * to direct that part-time employees shall be eligible for NYCERS membership." The board resolved, however, that, since some part-time employees had erroneously been accepted into membership, all those who had been accepted prior to November 6, 1981, the date of the resolution, would be continued as members. The November 6, 1981 resolution also instructed the Executive Director to implement administrative procedures to prevent any such recurrence.

As of November 8, 1981, all of the plaintiff physicians held positions requiring less than 35 hours of work per week. Three of them, Bhuvaneswar, Vennema and Tannenbaum, although employed in various positions before that date, had not filed applications for membership. In December 1981, these three plaintiffs filed requests under Laws of 1981 (ch 1044) for retroactive membership. Similarly, in December of 1981, the other four plaintiff physicians, Kligman, Prensky, Seligman and Wiederlight, although members of NYCERS prior to November 6, 1981, requested a transfer of benefits status to Tier I from Tier II or Tier III. NYCERS refused to process these applications on the ground that part-time employees are not eligible for membership.

Plaintiffs thereafter commenced this action, seeking declaratory and injunctive relief and asserting four causes of action: that the plaintiff physicians are entitled to NYCERS membership under the relevant statutory provisions; that defendants are estopped from denying the right of the four plaintiffs who are currently NYCERS members to transfer to Tier I retirement status; that they are also estopped from denying the applications for retroactive membership of the three plaintiffs who were not members before November 6, 1981; and that the denial of the plaintiff physicians' applications is prohibited by the Equal Protection and Due Process Clauses of the New York and the United States Constitutions. The parties have stipulated that any final judgment in this action will apply to all other doctors and dentists represented by Doctors Council who have been refused membership or transfers of status because of their part-time employment.

According to its present Executive Director, who has been with the retirement system in various capacities since 1958, NYCERS has had a "continuing" and "longstanding" policy of excluding part-time employees from membership. NYCERS

acknowledged that some part-time employees had been accepted as members, but insisted that such instances were the result of error, usually caused by the absence of complete and accurate information as to the nature of the applicant's job or a lack of awareness by staff members that the applicant's job title represented a part-time position. According to NYCERS, its policy, upon discovery of such mistakes, has been to terminate the part-time employee's membership and refund all of his or her contributions.

To support their position, defendants submitted two internal memoranda, one dated November 26, 1970 and the other, October 12, 1971, from Arthur Van Houten, the then secretary of NYCERS, in which he informed the staff that, under NYCERS' rules and regulations, part-time employees were excluded from membership. Defendants submitted a third memorandum, also signed by Van Houten and dated August 16, 1971, denying NYCERS membership to a transcribing typist in the Department of Social Services because she was a part-time employee. According to Van Houten, these 1970-1971 memoranda "reflect the legal advice which I received at that time from the Corporation Counsel to the effect that, pursuant to the applicable law and regulations governing the operations of NYCERS, part-time employees were not eligible for membership." That advice, based on a review of the pertinent statute, NYCERS' rules and an earlier 1936 opinion of the Corporation Counsel was ultimately set forth in a letter from the Corporation Counsel to Van Houten, dated November 24, 1974, stating, "[I]t has been the consistent practice of the Retirement System for at least 36 years, and apparently from the inception of the System, to follow the foregoing interpretation, as set forth in the [1936] opinion of the Corporation Counsel, that part-time employees are ineligible for membership."

In an affidavit in support of plaintiffs, however, Van Houten maintained that the Corporation Counsel's 1974 opinion was a "new position", and that NYCERS' policy, to the contrary, had been to accept part-time employees as members. Van Houten cited the minutes of meetings of the Board of Estimate, which, until 1969, had acted as NYCERS' board of trustees, claiming that "a review of the first volume of those minutes for the years 1930, 1940, 1950, 1960, and 1965 indicates that per diem, per session, hourly and part-time employees were both members of NYCERS and received retirement benefits from the system in significant numbers in each of those years." Van

Houten further pointed out that "NYCERS members in those payroll categories included not only doctors, but also non-per annum employees in [a variety of titles, including laborer, cleaner, dock-builder, senior stationary engineer]."

In reply, defendants presented an analysis of the Board of Estimate minutes upon which Van Houten relied to demonstrate that of the approximately 131 employees mentioned in the Board minutes only two ever sought retirement credit on the basis of less than full-time employment. One of these part-time employees was apparently a doctor, paid on a per session basis. Most of the employees mentioned in the Board minutes were classified as "per diem" or "hourly", terms which, according to defendants, only describe the method by which an employee's pay is computed and do not, contrary to Van Houten's conclusion, indicate part-time employment status. In fact, a review of the still-existing NYCERS files of the per diem and hourly employees mentioned in the Board minutes disclosed that they all had been full-time employees.[1]

Plaintiffs also submitted the affidavits of Donald C. Meyer, the Executive Director of Doctors Council, and Robert Pick, a former city negotiator. Dr. Meyer stated that he had been employed by the city as a sessional dentist since 1957 and had been a NYCERS member since 1958, and that such membership was required as a condition of his employment. Pick, as Assistant Director of Labor Relations for the city between 1966 and 1979, was charged with the responsibility of negotiating contracts covering professional medical personnel employed by the city and HHC. During the 1960's the city employed approximately 1,000 physicians represented by Doctors Council, most of whom worked on a part-time, per session and hourly rated basis. According to Pick, these doctors were entitled to membership in NYCERS as "part of the terms and conditions of [their] employment". When Pick negotiated the first contract with the newly established Doctors Council for the city in 1972, "there was no issue raised or made over the continued entitlement of doctors, whether full-time, part-time or per session to membership in NYCERS." Pick further stated that, as HHC's Director of Labor Relations from 1980 to 1982, he was aware that doctors were afforded membership in NYCERS, "irrespective of their per annum, per session or

---

1. One NYCERS member who had worked full time for approximately 21 years of his 23-year career had a short period of part-time service in the middle of his career. This employee had joined NYCERS as a full-time employee and retired as a full-time employee.

full-time/part-time status." Plaintiffs allege that of the 1,300 part-time doctors currently in the employ of the city or HHC, approximately 500 are NYCERS members.

Finally, NYCERS demonstrated that, as of December 31, 1983, the city engaged 45,504 part-time employees, exclusive of HHC's part-time employees, whose numbers could not be determined since HHC's statistical data was not available. Only 286 of these part-time employees were NYCERS members. The aggregate annual earnings of the 45,218 part-time employees who were not NYCERS members were $254,027,502.

On average, the city funds more than 80% of a member's retirement benefits. The Chief Actuary of the five New York City actuarially funded retirement systems estimated that, if all part-time city employees were permitted to become members of NYCERS, the increased annual cost to the city would be in excess of $27,500,000, a figure exclusive of the additional costs which would be incurred were HHC's part-time employees included. Moreover, according to the Chief Actuary, if the city's part-time employees chose to purchase premembership service credit, assuming five years to be the norm, the city and related agencies would be required, by "conservative estimate", to increase their annual pension contributions by $34,000,000.

 Special Term denied plaintiffs' motion for summary judgment and, on their cross motion, granted summary judgment to defendants dismissing the first (statutory) and fourth (equal protection) causes of action, and declaring accordingly. It denied the cross motion with respect to the second and third (estoppel) causes of action. The parties have cross-appealed, each from the adverse aspects of the determination. We modify only because Special Term should not have dismissed the first and fourth causes of action when it declared in defendants' favor on these causes. *(Lanza v Wagner,* 11 NY2d 317, 334; *New York Mobile Homes Assn. v Steckel,* 11 AD2d 751, *affd* 9 NY2d 533.)

 Membership in NYCERS is limited to persons in "city-service" (Administrative Code of City of New York § B3-3.0, recodified as § 13-104), which is defined, in relevant part, as "service, whether appointive or elective, as an officer or employee of the city or state of New York, of any agency thereof and of any court, so far as such service is paid for by the city". (Administrative Code § B3-1.0 [3] [a], recodified as § 13-101 [3]

[a].) Admittedly, the statute nowhere specifically defines the term "service" as either full time or part time. While arguably encompassing persons performing part-time service, the general definition of "city-service", when considered in the context of the myriad job classifications within the sprawling city work force, cannot be construed to include part-time employment. The city's employment structure contains literally thousands of job classifications and numerous compensation variables. It hires employees who work a regular 35-hour week as well as those special or temporary employees who work a few days or weeks a year, or on a seasonal basis. Moreover, some city employees are paid from city treasury funds while others are paid from Federal funds; still others are compensated from the fees generated by the particular city agency for which they work, rather than the city treasury, while the employees of quasi-public institutions such as the Metropolitan Museum of Art and the New York Zoological Society are paid from city funds. (See, Rules and Regulations of Board of Estimate, NYCERS § 11 [a] [c] [1947].)

Indeed, the Legislature recognized the need for flexibility in applying NYCERS' general terms, including "city-service" (Administrative Code § B3-1.0 [3] [a], recodified as § 13-101 [3] [a]), to the city's complex employment structure. Administrative Code § B3-1.0 (recodified as § 13-101), the definitional section of the NYCERS act, contains a caveat: "The following words and phrases as used in this title, unless a different meaning is plainly required by the context, shall have the following meanings". Thus, by the use of the phrase "unless a different meaning is plainly required by the context", the Legislature not only foresaw the need for, but explicitly sanctioned, administrative interpretation of NYCERS' general terms, including "city-service".

Nor, in determining the scope and meaning of the term "city-service", are we foreclosed from inquiry into the statute's legislative history or consideration of its administrative interpretation merely because the Administrative Code's general language may arguably be broad enough to encompass part-time employees. (See, New York State Bankers Assn. v Albright, 38 NY2d 430; see also, Uniformed Firefighters Assn. v Beekman, 52 NY2d 463, 471.) In construing a statute the "[a]bsence of facial ambiguity is * * * rarely, if ever, conclusive." (New York State Bankers Assn. v Albright, supra, at 436.) The "plain meaning rule", upon which plaintiffs rely, has been resoundingly rejected by the Court of Appeals.

"When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination' " *(supra,* at 437). "Inquiry into the meaning of statutes is never foreclosed at the threshold" *(supra,* at 436). Thus, an agency charged with the implementation of a statute is not bound by a plain meaning statutory interpretation which was never intended nor mandated by its terms. In any event, section B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]) of the Administrative Code does not specifically include part-time city employees within its definition of "service". As already noted, it fails to define "service" in terms which either include or exclude part-time service.

It is well settled that the construction given a statute by the agency responsible for its administration, if not irrational or unreasonable, will be upheld *(Matter of Howard v Wyman,* 28 NY2d 434, 438; *Matter of Meko Holding v Joy,* 107 AD2d 278, 283; *Matter of Transamerica Ins. Group [Markland],* 107 AD2d 591, 593), particularly where, as here, "the interpretation of a statute or its application involves knowledge and understanding of underlying operational practices". *(Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459.) Moreover, when, as here, the common experience has been to acquiesce in the "practical construction" of the administering agency for a long period of time, the administrative interpretation " 'is entitled to great, if not controlling, influence.' " *(Kranker v Levitt,* 68 Misc 2d 224, 227 [quoting *Chicago v Sheldon,* 9 Wall (76 US) 50, 54], *affd* 30 NY2d 574; *accord, Uniformed Firefighters Assn. v Beekman, supra,* 52 NY2d, at 472.)

Although a legislative history is not available, NYCERS has maintained a policy of excluding part-time employees from membership since its creation in 1920 (L 1920, ch 427). The earliest available evidence of its interpretation of section B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]) is found in two opinions of the Corporation Counsel issued in 1936 and 1937. In the 1936 opinion, which dealt with a NYCERS member's claim for premembership credit for service as counsel to four different city-wide investigative committees, the Corporation Counsel laid down general guidelines for determining whether an employee is engaged in "city-service" within the meaning of section B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]). These guidelines were subsequently incorporated into rule 11 (f) of

NYCERS Rules and Regulations, adopted in 1947.[2] As even plaintiffs acknowledge, NYCERS Rules and Regulations, including rule 11 (f), were not intended to change the practices of the retirement system, but were to serve as a codification of these practices. Both the general guidelines and rule 11 (f) require full-time service as a condition of eligibility for NYCERS membership. In his 1937 opinion, the Corporation Counsel referred to the "general standards" in the 1936 opinion and reaffirmed his view that full-time service was a prerequisite to NYCERS membership.

Furthermore, it is significant that the Legislature has never seen fit to amend the Administrative Code to bar the exclusion of part-time employees from NYCERS membership, particularly in view of the 1977 adoption by the Legislature of a new State pension plan which, for the first time, permitted part-time employees to become members of the State pension system. (Retirement and Social Security Law § 500 [b] [4] [a].) In enacting this legislation, the Legislature provided that New York City employees would "be eligible or ineligible for membership in [NYCERS] in the manner provided for by the relevant provisions of the New York city administrative code and other relevant laws and rules and regulations." (Retirement and Social Security Law § 500 [b] [1].) The Legislature's failure to extend NYCERS membership eligibility to part-time city employees must be viewed as an acceptance of NYCERS' practice of excluding part-time employees from membership. (See, *Uniformed Firefighters Assn. v Beekman, supra,* 52 NY2d, at 472.)

The record contains other evidence pointing to NYCERS' long-standing policy of limiting membership to full-time employees. Its annual reports for the years 1969-1979 state that membership is available to "City employees, in full-time positions." The already noted 1974 opinion of the Corporation Counsel reaffirmed that part-time employees were not eligible for NYCERS membership. The present Executive Director and the Chief of NYCERS Member Services Division both state that the administrative practice has been to exclude part-time employees from membership. This position is further but-

2. Rule 11 (f) provides: "No person who is paid other than a regular per annum salary, who renders less than full-time service *[sic]* not required to keep the regular office hours of the agency in which he renders service, is not required to report at a given time or place and is not subject to the discipline of the agency shall, by such service, acquire any right or benefit in the retirement system."

tressed by numerous letters from the Chief of the Membership Division, dated between 1971 and 1981, rejecting membership applications on the basis of part-time employment.

Thus, on the basis of its interpretation of "service" (Administrative Code § B3-1.0 [3] [a], recodified as § 13-101 [3] [a]) as being synonymous with full-time service, NYCERS has clearly demonstrated a policy and practice of excluding part-time employees. Although Van Houten, the then NYCERS Executive Director, wrote two staff memoranda in 1970 and 1971 stating that part-time doctors and dentists were exempt from the general rule excluding part-time employees from membership, a search of NYCERS' records fails to reveal any justification for the exception, the origin of which is attributed to administrative mistake. It is clear that the board of trustees never approved any such exception.

Plaintiffs argue that provisions of the Administrative Code other than section B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]) compel the conclusion that part-time employees are entitled to NYCERS membership. For example, they cite section B3-3.0 [1] (recodified as § 13-104 [1]) which defines those who may become NYCERS members as "[a]ll persons in city-service, as defined in this title". That provision, however, does not require the extension of NYCERS membership eligibility to those employed on a part-time basis,[3] since it extends membership only to those in "city-service" as that term is defined in section B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]).

Plaintiffs also argue that section B3-5.0 (b) (recodified as § 13-107 [b]), which requires NYCERS' board of trustees to "fix and determine how much service rendered in any year shall be the equivalent of a year of service and of parts thereof", mandates the board to permit part-time employees to become members. They also cite rule 24 of NYCERS Rules and Regulations, which provides for the conversion of part-time and sessional service to full-time equivalent service.[4] Neither sec-

---

3. Plaintiffs presumably cite section B3-3.0 (1) (recodified as § 13-104 [1]) because it mandates membership for "city-service" workers in the competitive class. Although plaintiffs contend that "[m]any part-time and sessional doctors hold civil service positions in the competitive class", it should be noted that all of the plaintiff doctors stated that they served in noncompetitive job classifications.

4. That rule 24 refers to "service paid for by the hour, session, night, etc." does not mandate eligibility for part-time employees. A full-time employee can be compensated on a per diem or hourly basis. Employees of the Rapid Transit Railroad System, for example, are generally full-time employees compensated on an hourly basis.

tion B3-5.0 (recodified as § 13-107), nor rule 24, however, pertains to NYCERS membership eligibility. Section B3-5.0 (a) (recodified as § 13-107 [a]) expressly states that it is "[s]ubject to the following and to all other provisions of [this act]". The application of section B3-5.0 (recodified as § 13-107) and rule 24 is accordingly limited to those engaged in "city-service" as defined in section B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]). *(See, e.g., Matter of Keane v Leary,* 34 AD2d 771, *affd* 29 NY2d 713.)*

Finally, plaintiffs cite section B49-9.3 (a) (ii) (recodified as § 12-126 [a] [ii]), which, insofar as is relevant, defines a "city retiree" for purposes of determining eligibility for receipt of retiree health benefits as: "[a] person who: (1) is receiving a retirement allowance, pension or other retirement benefit from a retirement or pension system maintained by the city; and (2) immediately prior to such person's retirement as a member of such system, was a city employee, or was an employee of the board of education employed under terms prescribing a work week regularly consisting of twenty or more hours during the fiscal year". Plaintiffs argue that this section clearly contemplates retirees who were part-time employees; otherwise, the minimum requirement of a 20-hour work week for retirement health benefits would be unnecessary. This claim is unavailing since the only portion of the section relating to part-time employment, i.e., a work week of less than 35 hours, is limited to Board of Education employees. Whether full time or part time, employees of the Board of Education, which has its own separate retirement system, are not eligible for NYCERS membership. (Administrative Code § B3-1.0 [3] [a], recodified as § 13-101 [3] [a].) Furthermore, to the extent that section B49-9.3 (a) (ii) (recodified as § 12-126 [a] [ii]) specifically provides that the term "employee", as used in that section, includes part-time employees, it militates against plaintiffs' argument that part-time employees are generally included within the meaning of that term.

We thus agree with Special Term that the Administrative Code does not mandate NYCERS to extend membership to part-time employees. In the absence of a genuine issue of fact, summary judgment was properly granted *(Barr v County of Albany,* 50 NY2d 247, 254) on the first cause of action alleging that the plaintiff doctors are entitled to NYCERS membership under the relevant statutes.

■ In asserting a denial of equal protection, plaintiffs argue that there is no "rational basis to distinguish between part-

time and full-time doctors with respect to pension entitlement." The Supreme Court has consistently recognized that "the Fourteenth Amendment does not deny to [the] States the power to treat different classes of persons in different ways." *(Reed v Reed,* 404 US 71, 75; *see, Matter of Tolub v Evans,* 58 NY2d 1, 8; *Montgomery v Daniels,* 38 NY2d 41, 61.) To withstand equal protection analysis, a classification which, *inter alia,* provides disparate compensation or benefits to public employees must be "reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *(Royster Guano Co. v Virginia,* 253 US 412, 415; *cf., Weissman v Evans,* 56 NY2d 458, 466.) We find that a classification which distinguishes between full-time and part-time employees is rationally based and substantially related to the allocation of city resources.

To provide NYCERS membership solely to full-time employees is to recognize that only employees who devote their careers in full service to the city should be entitled to the substantial benefits of the retirement system. As already noted, NYCERS had approximately 184,000 active members and 94,000 retirees as of June 30, 1984. Its annual pension payroll was approximately $619,000,000. If the 45,504 part-time employees working for the city and various related independent agencies as of December 31, 1983, excluding HHC's, were to become NYCERS members, the increased annual cost to the city and its related agencies would be in excess of $27,500,000. In addition, the "conservative estimate" of the cost of purchasing premembership service credit for these part-time employees would be $34,000,000. The expenditure of such a considerable sum as against the saving to the public fisc provides the rational basis for excluding part-time employees from NYCERS membership. That the difference in treatment works to the disadvantage of the part-time employee is, from a constitutional standpoint, of no moment. "[E]very line drawn by a legislature leaves some out that might well have been included." *(Village of Belle Terre v Boraas,* 416 US 1, 8.)

Plaintiffs' argument that the distinction is arbitrary because Congress and the State Legislature have included part-time employees in the Social Security and the State pension systems, respectively, is unpersuasive. The Federal, State and city governments, understandably, all have different fiscal

resources and policies, and may choose to include or exclude part-time employees without regard for what another level of government has done. In any event, a fiscal decision which concerns an estimated expenditure of $34,000,000 is hardly an inconsequential matter, as plaintiffs argue. The distinction between employees is clear and well recognized and does not violate the Equal Protection Clause.

■ Special Term also held that issues of fact barred dismissal of plaintiffs' estoppel claims, which apply to all seven of the plaintiff doctors. We agree. Plaintiffs allege, and defendants deny, that part-time doctors were admitted to NYCERS regularly, rather than as a result of a "mistake" by NYCERS administrators, and that the plaintiff doctors relied on NYCERS' past practice concerning membership in determining to accept part-time employment with the city or HHC.

Estoppel is not available against a governmental entity to create a right where none exists. (Matter of McLaughlin v Berle, 71 AD2d 707, 708, affd 51 NY2d 917.) Thus, a party cannot avoid the effect of a clear statutory provision through the failure of a governmental agency to enforce the law. (Matter of Galanthay v New York State Teachers' Retirement Sys., 50 NY2d 984; Matter of Owens v McGuire, 121 AD2d 292, 295; Matter of Syrewicz v New York State Teachers' Retirement Sys., 79 AD2d 1072; Matter of Hauben v Goldin, 74 AD2d 804, 805; Matter of McLaughlin v Berle, supra, 71 AD2d, at 708.) In certain circumstances, however, estoppel is available against a governmental entity. "[W]here a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised." (Bender v New York City Health & Hosps. Corp., 38 NY2d 662, 668; see also, La Porto v Village of Philmont, 39 NY2d 7.)

As both Bender and La Porto (supra) make clear, a governmental entity may be estopped from taking action where it is acting within the realm of discretion rather than in accordance with a statutorily imposed mandatory duty. In Bender, the plaintiffs had failed to file a timely notice of claim against the Health and Hospitals Corporation, as required by General Municipal Law § 50-e, but instead had filed one with the city. Although finding that the failure to serve the proper party did not fall within the class of "nonprejudicial mistakes or irregularities" which, by express statutory authority, were judicially

correctable *(supra,* 38 NY2d, at 667) the court, nonetheless, held that the defendant could be estopped from asserting the defense of failure to file a timely notice of claim, since the notice of claim requirement is not jurisdictional and may be waived in appropriate circumstances.

Although the court spoke in terms of acquiescence, rather than estoppel, to which it "bears a close resemblance" *(supra,* 39 NY2d, at 12) estoppel was similarly available in *La Porto.* There, a village had failed, for a period of more than 80 years, to assert its authority for taxation and other purposes over certain lands officially within its territorial limits but outside its boundaries as delineated by the map and description which it filed with the Secretary of State. While emphasizing that "where the State Legislature has acted to establish or alter municipal boundaries, the doctrine of acquiescence has no application" *(supra,* at 13), and, in effect, reaffirming the principle that estoppel cannot operate to defeat an express statutory mandate, the court held, nonetheless, that estoppel was available to support the conclusion that the assumed boundaries are the true boundaries where the property owners and other local governments relied to their detriment upon the village's inaction.

The courts have applied the doctrine of estoppel against a governmental entity under similar circumstances so long as the agency is not estopped from enforcing an affirmative statutory mandate. *(See, e.g., Landmark Colony v Board of Supervisors,* 113 AD2d 741; *Matter of 1555 Boston Rd. Corp. v Finance Adm'r of City of N. Y.,* 61 AD2d 187.)

Here, the statute does not require defendants to deny NYCERS membership eligibility to part-time employees. Indeed, defendants permitted 4 of the 7 plaintiff doctors who were admitted to membership prior to 1981 to retain that membership, and "grandfathered" other employees in the same situation into the retirement system. As in *Bender* and *La Porto (supra),* defendants may be estopped from exercising their discretion to exclude part-time employees from NYCERS membership if the plaintiff doctors relied, as alleged, upon express assurances or a practice, even if unauthorized, of extending NYCERS membership eligibility to part-time and sessional doctors.

The plaintiff doctors claim that they entered city or HHC employment and based their career, savings, insurance and retirement plans upon expectations of receiving full NYCERS

benefits.[5] In many cases, they claim, doctors entered city service primarily to be eligible for retirement benefits, and did so on the basis of representations by city or HHC administrators at the time of their hiring that they would be so eligible. Indeed, 4 of the 7 individual plaintiffs are NYCERS members who have had pension contributions deducted from their paychecks for many years. The doctrine of equitable estoppel should be available in just such circumstances. It would preclude a party from exercising a power he might otherwise legally exercise, when to do so would result in severe prejudice or injury to another party who has placed himself in a position of risk in reliance upon the express or implied representations of the first party.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Arthur E. Blyn, J.), entered October 3, 1985, should be modified to strike therefrom the provisions dismissing the first and fourth causes of action and, as so modified, affirmed, without costs or disbursements.

MURPHY, P. J. (dissenting). The individual plaintiffs in this action are seven physicians employed by the New York City Health and Hospitals Corporation. Four of their number have applied for membership in the New York City Employees' Retirement System (NYCERS), while the remaining three are already members and have applied to transfer within the system so as to receive greater benefits. Plaintiffs' membership and benefits applications were filed in December 1981 but were neither approved nor disapproved by NYCERS. NYCERS' inaction persisted until January 1983, when plaintiffs commenced the present lawsuit against NYCERS and two of its officers. Plaintiffs sought a judgment declaring that they were eligible for NYCERS membership and directing NYCERS to grant their pending applications. They alleged in their first cause of action that NYCERS' failure to admit them to the retirement system, or to afford them benefits, was in violation of section B3-3.0 of the Administrative Code of the City of New York (recodified as § 13-104) which provides that all persons employed in "city-service" are eligible for NYCERS membership. In their second and third causes, plaintiffs alleged that their decisions to become city employees were materially affected by NYCERS' actions and representations

---

5. This claim may be difficult to sustain in the case of the three plaintiff doctors who, although employed before that date in various positions, did not apply for membership until after November 6, 1981.

leading them reasonably to believe that they would be considered eligible for retirement system membership and benefits. Plaintiffs maintained, therefore, that NYCERS should be equitably estopped from denying their applications. In their fourth and final cause, plaintiffs urged that NYCERS had arbitrarily and capriciously treated them differently from other employees eligible for NYCERS membership, and that such disparate and irrational treatment was prohibited by the Equal Protection and Due Process Clauses of the New York and United States Constitutions.

Defendants answered the above-described complaint by alleging that only full-time per annum employees were eligible for NYCERS membership and that plaintiffs who were either part-time or sessional employees had no right to be included in the class of NYCERS eligibles.

In June and August 1984, respectively, plaintiffs and defendants moved and cross-moved for summary judgment. Special Term denied plaintiffs' motion in its entirety, but granted defendants' cross motion to the extent of dismissing plaintiffs' first and fourth causes. A trial was directed as to plaintiffs' second and third causes predicated on estoppel concerning which Special Term observed there were disputed issues of fact. The present appeal by plaintiffs and cross appeal by defendants ensued.

While I would agree with Special Term and my colleagues in the majority that triable issues are raised in connection with plaintiffs' estoppel claims, resort to the equitable theory of estoppel in this matter seems to me singularly unnecessary and inappropriate. This is because the statute upon which plaintiffs rely in their first cause of action clearly entitles them to the relief they seek as a matter of law.

So far as is here relevant, Administrative Code § B3-3.0 (recodified as § 13-104) provides:

"Except as otherwise provided in section B3-48.0 of the code, the membership of the retirement system shall consist of:

"1. All persons in city-service, as defined in this title".

"City-service" is defined in Administrative Code § B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]) as "service, whether appointive or elective, as an officer or employee of the city or state of New York, of any agency thereof and of any court, so far as such service is paid for by the city".

It is not disputed that plaintiffs are city employees paid for their services by the city. As such, it would seem that they

must be deemed persons in "city-service". Indeed, as Special Term observed, plaintiffs "certainly are engaged in city-service under section B3-1.0 (3)." The conclusion would appear unavoidable that plaintiffs, as persons in city-service, are eligible for NYCERS membership pursuant to Administrative Code § B3-3.0 (recodified as § 13-104). Special Term, however, whose lead this court now follows, managed to conclude differently. Noting that the statutorily defined class of NYCERS eligibles is broad, Special Term opined that NYCERS had authority to exclude "certain categories of persons". Nowhere in its opinion does Special Term point to any legislative authority for NYCERS to exclude any "category of persons" from those otherwise entitled to participate in the retirement system. Rather the power of the agency to effect such exclusions is presented as self-evident: "There is no dispute that certain categories of persons, such as subcontractors and other independent contractors, have consistently been excluded from membership in NYCERS—even though they fall within the definition of 'city service'. Even plaintiffs do not argue that these exclusions are improper. It is thus impliedly conceded that 'the absence of ambiguity' facially in section B3-1.0 (3) is not conclusive here". Having thus purportedly demonstrated the propriety of administratively drawn exclusions from the statutorily defined class of NYCERS eligibles, Special Term went on to consider whether part-time employees constituted a category of persons permissibly excluded from NYCERS membership. Although the inquiry was framed by Special Term as one respecting legislative intention, apart from the statutory language there is little or no indication as to what that intention may have been; as Special Term acknowledged, no legislative history is available concerning the relevant Administrative Code provisions. Undaunted, Special Term turned instead to an examination of agency intent and practice. The court ventured that NYCERS, since its inception in 1920, had consistently excluded part-time employees from membership, and that the Legislature which was presumptively aware of this practice never amended the subject Administrative Code section to provide specifically that part-time employees were eligible to join NYCERS. From this the court concluded that NYCERS' exclusion of part-time employees did not conflict with any legislative purpose and was a proper exercise of agency power.

The plain meaning rule, forbidding judicial forays into statutory construction when the language of an enactment is

clear, has been long with us and often relied on. *(See, e.g., McCluskey v Cromwell,* 11 NY 593, 601-602; *Meltzer v Koenigsberg,* 302 NY 523, 525; *Matter of Roosevelt Raceway v Monaghan,* 9 NY2d 293, 304; *Matter of Barton v Lavine,* 38 NY2d 785, 787; *Matter of Shea v Falk,* 10 AD2d 142, *affd* 8 NY2d 1071.)* Its salutary purpose is, of course, to prevent courts from prohibitively intruding upon the legislative function. *(See, e.g., McCluskey v Cromwell, supra,* at 601-602; *Matter of Shea v Falk,* 10 AD2d, at 144, *supra.)* Surely, so fundamental a precept should not be lost sight of. Unfortunately, it has been in this case.

If, as seems clear, plaintiffs are in fact municipal employees paid by the city, they are persons in "city-service" as that term is defined in Administrative Code § B3-1.0 (3) (a) (recodified as § 13-101 [3] [a]) and, therefore, eligible for NYCERS membership and benefits pursuant to Administrative Code § B3-3.0 (recodified as § 13-104). The language of the Administrative Code which Special Term conceded is "facially unambiguous" simply does not permit any other conclusion. It must be presumed that had the Legislature meant to except part-time employees from NYCERS eligibility, it would have so provided. Indeed, Administrative Code § B3-3.0 (recodified as § 13-104) starts out, *"Except as otherwise provided* in section B3-48.0 of the code, the membership of the retirement system shall consist of" (emphasis added). Nowhere among the exceptions listed in Administrative Code § B3-48.0 (recodified as § 13-179) is there one sanctioning the exclusion of part-time employees.

NYCERS, apparently unphased by the absence of any express legislative authority, maintains that it is nevertheless empowered to carve out substantial exclusions from the statutorily constituted membership class. This ignores, however, that the statute does not permit NYCERS any discretion in this area. To the contrary, Administrative Code § B3-3.0 (recodified as § 13-104) states unequivocally that, apart from the above noted exceptions "the membership of the retirement system *shall* consist of * * * *[a]ll* persons in city-service" (emphasis added). If the class of NYCERS eligibles is to be recomposed to limit membership to those who are employed by the city on a full-time per annum basis, it would seem that the statute which at present plainly embraces a much wider class of eligibles must be amended. Amending the law is, however, the province of the Legislature, not the courts, and

certainly not the agencies charged with administering the law as it is.

Given the absolute clarity of the statutory provisions at issue, I see no reason whatsoever to explore the Legislature's intentions further. In any case, the inquiry undertaken by Special Term was not so much concerned with the Legislature's intent as it was with the intent and practice of the administering agency. In essence, Special Term purported to establish the propriety of administratively excluding certain categories of persons from the statutorily defined class of NYCERS eligibles, by resort to agency precedent. The issue, however, is not whether the agency has acted consistently, but whether it has acted in accordance with the governing statute. Where, as here, the claimed agency practice runs contrary to the unambiguous wording of a statutory provision, it is not, no matter how long-standing, entitled to any interpretive weight. *(Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459; *Matter of Country-Wide Brokerage v Harnett,* 58 AD2d 517; *see also,* McKinney's Cons Laws of NY, Book 1, Statutes § 128 [b]; § 129 [b].)

Reliance on the doctrine of practical construction is, however, completely inappropriate in this case for another reason: NYCERS has never had any consistent practice or coherent policy categorically excluding from the retirement system any persons otherwise entitled to membership. Special Term's assertion that independent contractors have been consistently excluded from NYCERS "even though they fall within the definition of 'city service' " betrays a rather basic misunderstanding. Independent contractors have, of course, never been permitted to join NYCERS. This is, however, not attributable, as Special Term would have it, to agency practice but to simple observance of the statutory requirements. Independent contractors are not city employees, hence, they are not in "city-service" as that term is defined in Administrative Code § B3-1.0 (3) (a) and, therefore, are not eligible for NYCERS membership. The example then by which Special Term sought to establish the permissibility of administrative exclusions from the statutorily defined class of NYCERS eligibles is fundamentally flawed. Yet, even if the premise from which it proceeded, i.e., that independent contractors fall within the code definition of "city-service", were valid, the example's relevance to the present matter would be hard to discern. The propriety of one administratively drawn exclusion does not establish the propriety of such exclusions generally. Plaintiffs

are not independent contractors. Thus, even if the ineligibility of independent contractors for NYCERS membership did result from the agency's exclusionary practice, this would hardly explain the exclusion of plaintiffs.

What then is the long-standing agency practice pursuant to which NYCERS would bar plaintiffs from membership? NYCERS urges that since the inception of the retirement system in 1920, part-time and non-per annum employees such as plaintiffs have been consistently excluded from NYCERS membership. As evidence of such a practice, NYCERS relies first upon an opinion of the Corporation Counsel dating from 1936, some 16 years after the system's establishment. The opinion concerned the application of an attorney for additional retirement credit based upon services rendered by him as counsel to the Bar Association in an ambulance chasing investigation and, subsequently, as counsel to a legislative investigating committee. The Corporation Counsel advised quite simply that as to the services performed for the Bar Association, the attorney was not entitled to credit since he had not been retained by the city. Credit was recommended, however, for the services rendered the legislative committee in deference to the State Comptroller, who had indicated that such services would be considered city-service. In the course of reaching this determination, which itself indicates absolutely nothing as to agency practice respecting part-time and non-per annum employees, the Corporation Counsel set forth certain general guidelines to aid the Board of Estimate (the predecessor to the present NYCERS board of trustees) in determining what service could be classified as employment qualifying for NYCERS credit. Among those guidelines was one which provided: "4. Such employment should be of a more or less continuous character and should take up substantially all of the time of the employee. The employee should be required to report and keep office hours at a public office and to perform his work subject to the direct supervision and control of public officials. In other words, the services must be of the character of those embodied in a master and servant relationship and not in the nature of those performed by an independent contractor." Clearly, this guideline, volunteered by the Corporation Counsel in the context of an opinion in which it was to have no application, neither reflected any existing practice by NYCERS nor settled its future policy concerning the admission of part-time employees to the retirement system. Indeed, in 1937, less than one year after the opinion's issuance, the

Board of Estimate once again sought the Corporation Counsel's guidance. This time, however, the inquiry did concern the apparently still open question of whether part-time employees were entitled to retirement system service credit. While cautioning that his opinion was not conclusive, the Corporation Counsel opined that the subject employee's services which were less than full time should not be credited.

The 1936 and 1937 opinions of the Corporation Counsel notwithstanding, NYCERS did not promulgate any rule or regulation concerning even arguably the eligibility of part-time non-per annum employees to join the system until some 10 years had passed. Thus, in 1947 NYCERS adopted rule 11 (f) which states: "(f) no person who is paid other than a regular per annum salary, who renders less than full time service not [sic] required to keep the regular office hours of the agency in which he renders service, is not required to report at a given time or place and is not subject to the discipline of the agency shall, by such service, acquire any right or benefit in the Retirement System." NYCERS claims that this rule simply reflected existing practice. Assuming that this is the case, it merely begs the question as to what the practice was. The rule itself is hardly a model of clarity since the various disqualifying factors listed may be understood either as stating alternative grounds for exclusion, or conditions whose existence together would require exclusion, no one factor being sufficient. Indeed, to the extent that the rule reflected existing NYCERS practice it would appear that the latter interpretation of the rule is the correct one. As representative Board of Estimate minutes from 1930 and 1940 contained in the record indisputably show, both non-per annum and part-time employees were routinely admitted to the retirement system in the years preceding rule 11 (f)'s adoption. And as Board of Estimate minutes from 1950, 1960 and 1965 show, this continued to be the NYCERS practice long after rule 11 (f) was adopted.

It should be noted that at the same time rule 11 (f) was adopted, the Board of Estimate also adopted rule 24 which states:

"Provided that not more than one year shall be allowed for all allowable paid-for service in any calendar year and not less than one year for 250 or more days of paid-for service (Code B3-5.0.b);

"(a) Credit of one-hundredth of a year shall be allowed for

each 3 days, or other equivalent service, paid for on a per annum basis.

"(b) Credit of one-hundredth of a year shall be allowed for each 2 days, or other equivalent service, paid for on a basis other than per annum.

"(c) Service paid for by the hour, session, night, etc. and equated on a basis for other than that of an eight-hour day shall be noted in the report to the Board recommending service allowance."

Although this rule concerns the computation of service credit, rather than retirement system eligibility criteria, there would obviously be little need to compute credit for non-per annum service (see, subd [b]) or "Service paid for by the hour, session, night, etc. and equated on a basis for other than that of an eight-hour day" (subd [c]), if non-per annum and part-time employees were to be excluded from NYCERS pursuant to the contemporaneously promulgated rule 11 (f).

As the above noted Board of Estimate minutes would seem to indicate, part-time and non-per annum city employees were routinely admitted to NYCERS following the adoption of rule 11 (f). This practice was apparently unobjectionable to the Corporation Counsel who, in 1952, issued an opinion concerning whether a part-time and sessional doctor employed by the city would be entitled to service credit for the time he spent in the military (opn No. 102565). Although the doctor had not worked a sufficient number of sessions in any one given year, either before or after his military service to entitle him to a full year's credit, the Corporation Counsel nevertheless took it for granted that the doctor was eligible to join the retirement system, stating with regard to him, "It is my opinion that * * * *a per session employee who is a member of a retirement system* [here NYCERS] should receive full service credit for the period of his military service" (emphasis added).

There is absolutely no evidence contained in the record indicating that prior to 1970, rule 11 (f) was understood or applied to exclude part-time and non-per annum employees from NYCERS. Rather, it would appear, as Arthur Van Houten, the chief administrator of NYCERS between 1968 and 1975, explains in his affidavit, that until the early 1970's, rule 11 (f) was construed and implemented as a measure to insure that independent contractors, having no continuing "master servant" employment relation with the city, were not admitted to the retirement system. Although beginning in

1970, NYCERS memoranda and correspondence indicate that some attempt was being made to exclude part-time and sessional employees from the system, these documents can be of little real comfort to defendants. What they seem to show is, that to the extent that there was any existing policy respecting the exclusion of part timers and per·session employees, it had been unevenly enforced and was not even known of in many sectors of the retirement system. In any case, assuming that the 1970's witnessed some attempt by NYCERS to bar part-time and non-per annum employees from the system, NYCERS concedes that doctors, the very group whose entitlement is here at issue, were for some unexplained reason exempted from exclusion.

Evidently, during the early 1970's, the NYCERS board of trustees remained uncertain as to the propriety of excluding part timers, for in 1974 it once again requested advice from the Corporation Counsel. The Corporation Counsel responded by undertaking a review of its 1936 and 1937 opinions and rule 11 (f) from which it concluded that part timers were not entitled to NYCERS membership. There is, however, precious little in the record to indicate that the Corporation Counsel's advice was translated into any firm and consistently enforced agency policy. In fact, plaintiffs Seligman, Prensky and Kligman were all either admitted to NYCERS, or allowed to remain members, subsequent to the 1974 Corporation Counsel opinion, and the record contains persuasive evidence indicating that at least as late as 1978, NYCERS, with full knowledge of an employee's part-time status, permitted membership in the system.

NYCERS' uncertainty as to what policy to follow concerning part-time employees apparently persisted, for in 1980, the NYCERS board of trustees appointed a subcommittee to study the matter. After extended deliberation, the subcommittee remained deadlocked, and in June 1981, submitted a memorandum presenting the full board with two alternatives:

"1) To determine that the pertinent provisions of the Administrative Code and Rules of the System exclude part-time employees from membership and to accept no new membership applications from part-time employees; or

"2) To interpret the pertinent Administrative Code provisions as permitting part-time employees to join NYCERS, and to accept part-time applicants as members."

Obviously, as of mid-1981, NYCERS not only had no well-

defined policy or practice concerning the membership of part timers, but was sharply divided as to what course ought to be pursued prospectively.

Still undecided, the board of trustees in October 1981 again sought the Corporation Counsel's opinion. The Corporation Counsel, citing his 1936, 1937 and 1974 opinions, advised that NYCERS did not have the power to direct that part-time employees should be eligible for membership. Somewhat inconsistently, the Corporation Counsel also advised that it would be reasonable for all part-time employees already admitted to the system to continue as members.

Thus, on November 6, 1981, some 61 years after the establishment of the retirement system, NYCERS, for the first time, resolved that it did not have authority to admit part timers to membership, but that it would, nevertheless, permit all part timers who had been erroneously admitted, to remain within the system. The resolution concluded by directing the Subcommittee on Part-Time Employees to recommend criteria to distinguish part-time from full-time employees, which criteria would be employed in conjunction with administrative procedures to be adopted by the NYCERS Executive Director, to assure that part-time employees were not admitted to the retirement system. In October 1982, the NYCERS board, expressly conceding that it had never formulated any rules or regulations respecting part timers, finally resolved to amend its rules and regulations to provide that only those employed at least 35 hours per week would be eligible to become NYCERS members.

If the November 1981 and October 1982 NYCERS board resolutions demonstrate anything, it is that NYCERS was not only entirely unclear as to what its policy on the admission of part timers should be, but that it had not even the most rudimentary elements of a uniformly enforceable policy in place. As the resolutions acknowledge, more than 60 years after the inception of the retirement system, NYCERS had yet to establish standards for determining who would be considered a part-time employee, and had no commonly recognized administrative procedures to effect the exclusion of part timers from the system. In the absence of any policy or rules respecting the eligibility of part timers to join the system, it is hardly surprising that prior to 1981 many part timers were, in fact, admitted. Although NYCERS now attempts to explain this circumstance as the result of "clerical errors and incomplete or inaccurate information furnished to NYCERS by

employing agencies" (Nov. 6, 1981 resolution), it would seem clear that given the manifest indecision of the NYCERS board and the conceded lack of any pertinent rules or regulations, "errors", if they may be called that, were inevitable.

In my view, the record in this proceeding demonstrates conclusively that NYCERS has never had anything remotely resembling a consistent policy or practice of excluding part-time employees from the retirement system. At best, it can perhaps be said that NYCERS has sporadically made half-hearted and indecisive attempts to exclude some part timers, but that is not a sufficient basis to invoke the doctrine of practical construction. When agency practice is as uneven as it is in the present case, it simply does not permit any inference concerning legislative intent.

Given the evident uncertainty within NYCERS as to what its practice was and policy should be, it is truly remarkable that Special Term attached any significance to the fact that the Legislature never amended the Administrative Code to specify that part timers were eligible to join NYCERS. The Legislature cannot reasonably be charged with knowledge of an administrative "practice" which was apparently not followed or known of by many in the agency itself. Further, even if it had come to the Legislature's attention that it was the occasional practice of NYCERS to exclude part timers, there is no reason to suppose that the statute would or should have been amended in response; as the statute already extended eligibility to *all* city employees, there was plainly no need for any additional provision respecting part timers.

This, moreover, is not a case in which agency practice, even if it were more definite, would be entitled to any special deference. The question of how the NYCERS membership class should be composed is not one whose answer requires any special practical expertise; it does not involve an intimate understanding of agency operations or the evaluation of complex factual data *(see, Kurcsics v Merchants Mut. Ins. Co., supra,* 49 NY2d, at 459). As NYCERS itself recognized in its November 1981 resolution, eligibility for membership in the retirement system is a matter governed completely by statute and depends entirely upon how the statute is read. Thus, NYCERS, apparently understanding that it possessed no special competence in statutory construction, turned to the Corporation Counsel for advice and was told, "it is the intent of the provisions of the Administrative Code governing membership in NYCERS to exclude part-time employees from mem-

bership and accordingly, that the Board of Trustees does not have the power by resolution, amendment of the Rules and Regulations or otherwise, to direct that part-time employees shall be eligible for NYCERS membership" (Nov. 6, 1981 Resolution). Although NYCERS quite reasonably relied on the advice of counsel in what was essentially a question of statutory interpretation, that does not mean that the advice given was correct or is entitled to any special deference; it is simply the opinion of counsel and nothing more. That opinion, in my view, is quite simply wrong, as it flies in the face of the statute's clear wording. Nowhere in the statute is there even the slightest indication that the Legislature intended to exclude part-time employees from NYCERS membership.

Undoubtedly, the exclusion of part timers from NYCERS will save the city money. The meaning of a statute, however, does not vary to accomplish fiscal savings. If the city wishes, it may, of course, ask the Legislature to amend the relevant Administrative Code provisions, but in the meantime the statute must be read as it is by this court and be implemented as it is by the administering agency. This, in my opinion, requires that part-time employees be permitted to join and participate in the retirement system.

As a closing addendum, I would note that even if agency practice, such as it was in this case, were at all relevant to the meaning of the statute, it would still have been error for Special Term to grant defendant's motion for summary judgment dismissing plaintiffs' first cause of action. If plaintiffs have not made a showing entitling them to prevail on a summary judgment motion, they have, at a minimum, raised a factual issue as to whether NYCERS had any practice of excluding part-time employees from membership. The Board of Estimate minutes included in the record show, at the very least, that until 1965, part timers and non-per annum employees were admitted to the retirement system, and were credited for their service pursuant to rule 24 (see, supra). In addition, the affidavit of former NYCERS Administrator Arthur Van Houten states quite plainly that part timers were routinely permitted to join the retirement system through the early 1970's. And, although there is some evidence of NYCERS' exclusionary efforts thereafter, it is conceded that there was a recognized exception in favor of part-time doctors and dentists. Moreover, NYCERS' November 1981 and October 1982 board resolutions amount to virtual admissions that through the early 1980's there was sharp disagreement and, indeed,

confusion, within NYCERS as to what its policy respecting part timers should be; in fact, the most basic elements of a policy effecting the exclusion of part-time employees, namely, criteria to distinguish part- from full-time employees, had yet to be established.

If this evidence does not demonstrate conclusively, as I believe it should, that NYCERS, for more than 60 years after its institution, had no established policy dictating the exclusion of part timers, surely it is sufficient to raise a triable issue of fact. As it is axiomatic that the existence of a triable issue renders summary judgment inappropriate *(see, e.g., Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395, 404), it would seem plain that defendants' cross motion for summary judgment as to plaintiffs' first cause of action should have been denied.

Having made these observations concerning the impropriety of Special Term's grant of defendants' cross motion for summary judgment as to plaintiffs' first cause, I would hasten to reiterate that this case should not be decided based upon what may or may not have been the practice of NYCERS. NYCERS practice, whatever it was, has no relevance to the resolution of this matter. The Legislature in enacting Administrative Code § B3-3.0 (recodified as § 13-104) indicated quite clearly that it was performing the critical task of defining who was to be eligible for NYCERS membership. No discretion was left the NYCERS board to exclude any "category of persons" from the statutorily defined class.

Accordingly, I dissent and would modify the appealed order to grant plaintiffs' motion for summary judgment on their first cause of action.

Asch and Wallach, JJ., concur with Sullivan, J.; Murphy, P. J., dissents in an opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on October 3, 1985, modified, to strike therefrom the provisions dismissing the first and fourth causes of action and, as so modified, affirmed, without costs and without disbursements.