### PEOPLE *v.* ULSTER COUNTY SAV. INST.

#### In re MITCHELL.

#### (*Supreme Court, Special Term, Ulster County.* January, 1892.)

SAVINGS BANKS—INSOLVENCY—RESUMPTION OF BUSINESS—SCALING DEPOSITS.

> Laws 1882, c. 409, § 278, (2 Rev. St., 8th Ed., p. 1573,) declaring that when suit is brought against a savings institution, alleging its insolvency and demanding its dissolution, the court may grant such relief and render such judgment as the interests of the parties seem to require, allows the court to scale down deposits and authorize the resumption of business, where the effect of this will be to allow the institution to continue on a solvent basis. Affirmed by 31 N. E. Rep. 738.

Action in the name of the people against the Ulster County Savings Institution, alleging its insolvency, and demanding a dissolution. An order was made closing the institution and appointing a receiver, and it now moves for leave to resume business. Granted.

*I. N. Maynard,* Dep. Atty. Gen., for plaintiff. *Kenyon & Sharp,* (*A. Schoonmaker,* of counsel,) for defendant. *C. M. Preston,* bank superintendent, *in pro. per. John E. Van Elten,* for certain depositors. *Linson & Van Hoesen,* for receiver.

FURSMAN, J. The defendant was incorporated as a savings institution by act of the legislature passed April 12, 1851, (Laws 1851, c. 152.) It has accumulated up to the commencement of this action deposits to an amount exceeding $2,000,000. Its business affairs have been managed by 13 trustees, except that by death and resignations the number at this time is reduced to 11. The treasurer and assistant treasurer were appointed in 1867, and have held their respective offices continuously from that time down to the time of their removal, in September and October last, respectively. About the 17th of September, 1891, a defalcation, resulting from the misappropriation and abstraction of its funds on the part of the treasurer and assistant treasurer, was discovered. Thereupon, at the instance of the trustees, the superintendent of the banking department began an official examination of the affairs of the bank, and afterwards the bank was closed, and a report of its condition made to the attorney general, pursuant to statute. Afterwards this action was commenced by the attorney general for the dissolution of the bank and the appointment of a receiver, and such proceedings were had that a temporary receiver was appointed, who duly qualified and entered upon the discharge of his duties. A careful and accurate examination of the affairs of the bank by the superintendent disclosed that on the 1st day of November

last its liabilities were $2,474,465.89, and its assets $2,108,547.39; thus leaving a deficiency of $365,918.50. This deficiency is less than 15 per cent. of the liabilities of the bank, and it is now claimed and insisted that the bank can resume business as a solvent institution upon a basis of 85 per cent. of its liabilities, and application is made to this court for permission to do so. This application is made upon petitions on the part of all the trustees of the bank, and of the receiver, and by depositors representing upwards of $900,000 of deposits. The petitions show that the total number of depositors is in the neighborhood of 6,000, and that of those who are not petitioners a large number are depositors representing small amounts, who are widely scattered over Ulster county, some of whom reside in other counties, and also in other states, and that deposits to the amount of upwards of $150,000 are represented by persons whose residence and address cannot be ascertained. The petitions also show that, so far as can be learned, it is the universal desire of the depositors that the business of the bank shall be resumed; and it is asserted by counsel, and remains undisputed, that no depositor has expressed any unwillingness.

A careful study of the situation as presented by the petitions, by the official certificate of the superintendent of the banking department, and by the various arguments and suggestions of counsel, induces in my mind the belief that such a course will be beneficial to all parties, in case it is found that there is power in the court to authorize it. Such a course will continue in existence a long-established and hitherto useful institution, which has only now been impaired by the extraordinary misconduct of its treasurer and assistant treasurer. It will save to depositors a large amount of their funds, which must necessarily be consumed in expenses in case the action proceeds, or the bank is put in liquidation, and its assets distributed ratably among its creditors. It will save, moreover, to a large number of persons who are debtors to the institution, the loss that cannot be avoided from shrinkage in values, resulting from forced collections of mortgages, and will probably result in assisting to sustain generally the credit of business men who have at this time deposits in the bank. It has been the policy of this state for a long series of years to permit savings institutions, whose assets from any cause have shrunk below their liabilities, to resume business wherever it could be done upon a solvent basis; and this course has been uniformly, so far as I have been able to ascertain, recommended by the banking department. In 1879 this course was taken by Bank Superintendent Henry L. Lamb in the case of the Oswego City Savings Bank, and the supreme court permitted that institution, under like circumstances, to scale down its liabilities to depositors 10 per cent., and thereupon to resume business. Since that time the bank has been prosperous, and its deposits have steadily increased. In 1883, Bank Superintendent A. B. Hepburn, in his annual report to the legislature, approved the policy thus pursued by Superintendent Lamb. In that report he says: "No one can make a study of the failed savings banks without perceiving how much better it would have been for depositors in many instances had the deposits been scaled so as to render the bank solvent, and they have been allowed to continue business. This department, and the courts, now have by law sufficient power over the tenure of office of savings bank managers to secure the removal of incompetent or unfaithful men. With the funds still in the hands of trustees, under the direction of the court, and subject to the supervision of the superintendent, the depositors would have realized much more money, and the expensive management and costly and interminable litigation which succeeds insolvency as the night the day would have been avoided. It seems that our courts now have the power to reduce each individual deposit to an amount sufficient to render an insolvent savings bank solvent, and authorize the managers of the bank to charge against each

separate depositor such amount." Referring to the Oswego City Savings Bank, he adds: "The eminent success attending the scaling process in the only instance in which it has been tried in this state is a strong, practical argument in favor of providing by statute for carrying out what seems to be a law already." In 1885 Superintendent Willis S. Paine expressed his approval to the legislature as follows: "In the single instance in the history of the savings banks of this state in which the scaling process has been resorted to as a possible means of saving depositors from ultimate loss, the experiment has met with such marked success it is probable that in the future this remedy will be applied in preference to placing the affairs of temporarily embarrassed banks in the hands of receivers for liquidation." It will thus be seen that the opinion of those most familiar with the savings banks of the state, and whose duty it has been to exercise a supervision over their affairs, so far as the same has been expressed, indicates the propriety of permitting savings institutions to resume business wherever it can be done upon a solvent basis.

The remaining question is one of power. The statute which authorizes the institution of actions like the present provides that "the court before which such proceedings shall be instituted shall have power to grant such orders, and in its discretion from time to time modify or revoke the same, and to grant such relief and render such judgment as the facts or evidence in the case and the situation of the parties and the interests involved shall seem to require."[1] The power thus conferred seems to be sufficient to enable the court to make such orders and such disposition of the institution and its affairs as may appear to be for the best interests of the institution, its creditors and depositors. Savings banks are quite unlike ordinary banks. Commonly, banks are business corporations, have stock and stockholders and paid officers, and conduct their affairs with a view to profit. Their relation to their depositors is in no sense one of trust. They receive deposits to be paid upon the check or draft of the depositors, without interest or addition. Their profits, if any, are distributed among their stockholders, and their losses fall upon them, and their property is subject to sequestration at the suit of any creditor. A savings bank is an institution of quite a different character. Its relation to its depositors is in a large sense one of trust and confidence. It has no stock and no stockholders. Its depositors are not entitled to draw checks against it. It does not receive deposits to be paid upon demand simply, but for investment on securities taken for the benefit of the depositors. Its assets are held for distribution among its depositors ratably, and its losses fall in like manner upon its depositors; and no creditor or depositor can by diligence in the pursuit of any legal remedy obtain any advantage over any other creditor or depositor. Its profits and its losses fall upon each depositor according to his just proportion, and no depositor has a right in the distribution of its assets to obtain or receive his deposit in full at the expense of the other depositors. The assets, after deducting the necessary expenses, are held simply as belonging to and as security for all the deposits. It would seem, therefore, that no depositor has any just cause of complaint if he is not permitted to receive his deposit in full, in case the assets are insufficient to pay all the depositors in full. Nor would the trustees be justified in exhausting, or even impairing, the assets of the institution in payment in full of diligent depositors, and thereby leaving those who are less vigilant to receive a less sum than would be theirs if a just and ratable distribution were had. Under these circumstances, the assets of the bank being held for all the depositors, and the losses sustained by all, and there being no right in any depositor to insist upon the payment of his own claim in full at the expense of others, it is clear that the loss already sustained may and should be

[1] Laws 1882, c. 409, § 278, (2 Rev. St., 8th Ed., p. 1573.)

thus distributed, and the bank, if possible, permitted to resume business for the benefit of all depositors alike, that in the end each depositor may receive as much as possible.

In the case of *People* v. *Mechanics' & Traders' Sav. Inst.*, 92 N. Y. 7, the action was brought by a creditor (other than a depositor) to compel the receiver to pay certain judgments in favor of one Sistare, and it was substantially held that all creditors of savings banks, including depositors, stand upon an equal footing. The court says: "Upon insolvency, the assets and property of the corporation is a trust fund for the payment of creditors; and depositors, we think, stand as other creditors, having no greater, but equal, rights, to be paid ratably out of the insolvent estate." In the case of *Huntington* v *Bank*, 96 U. S. 388, speaking of savings banks, the court says: "It is not a commercial partnership; nor is it an artificial being, the members of which have property interests in it; nor is it strictly eleemosynary. Its purpose is rather to furnish a safe depository for the money of those members of the community disposed to intrust their property to its keeping. It is somewhat of the nature of such corporations as church wardens for the conservation of the goods of a parish, the college of surgeons for the promotion of medical science, or the society of antiquaries for the advancement of the study of antiquities. Its purpose is a public advantage, without any interest in its members. * * * It is, like many other savings institutions incorporated in England and in this country during the last sixty years, intended only for provident investment, in which the management and supervision are entirely out of the hands of the parties whose money is at stake, and which are *quasi* benevolent, and most useful because they hold out no encouragement to speculative dealing or commercial trading. * * * Very many such exist in this country. Among the earliest are some in Massachusetts, organized under a general law passed in 1834, which contained a provision that the income or profit of all deposits shall be divided among the depositors, with just deduction of reasonable expenses. They exist also in New York, Pennsylvania, Maine, Connecticut, and other states. Indeed, until recently, the primary idea of a savings bank has been that it is an institution in the hands of disinterested persons, the profits of which, after deducting the necessary expenses of conducting the business, inure wholly to the benefit of the depositors in dividends or in a reserved surplus for their greater security."

Courts of equity in other states have exercised the power here sought. In the *Case of Newark Sav. Inst.*, 28 N. J. Eq. 552, the power to scale down deposits and authorize the resumption of business by savings institutions was distinctly declared and exercised. The chancellor says: "This court has jurisdiction over all trusts, as well where the trust is held by a corporation as where the trustee is an individual. A savings institution, such as the petitioner, is a mere trustee. It has no stock. It receives the money of depositors for investment, and invests it on securities taken for the general benefit of the depositors. It is merely a large incorporated agency for receiving and loaning money on account of those to whom the money belongs. The interest received upon investments is to be ratably divided among the depositors. The depositors (in the absence of fraud on the part of the managers, from which personal liability would arise) have no recourse whatever for repayment of their principal or interest to anything except the general investments of the institution. The institution now before me was incorporated for the sole purpose of receiving and investing deposits. The design of the legislature in granting the charter was to promote industry and frugality, and preserve and husband the fruit of honest toil. It contemplated no benefit to the managers, but looked only to the security and advantage of the depositors. The trust created is a general or public trust. No depositor has, under the charter or in equity, any right to any particular security in the hands of the institution for his deposit, more than any other depositor. All the assets,

after deducting the necessary expenses, are held as a common fund for the security of all the depositors. It follows that no depositor has any reason for complaint if he is not permitted to receive his deposit in full, if there be even any uncertainty as to whether there will be assets enough to pay all the others in full. It follows also that the institution ought not, under such circumstances, to be permitted to exhaust such of its securities as are immediately convertible into cash without loss in the payment in full of clamorous or alert depositors, and leave for those who are less vigilant, or who may be less informed of the situation, securities which are less available, and on which such loss may be sustained as that the latter may fail to realize the full amount due them. In other words, the vigilant depositor ought not to be permitted to devolve all the losses of the trust on the others, who are as much entitled to payment in full as he is. To insure justice to the helpless is one of the most valuable prerogatives of this court. Equality in the present case is equity. I have no doubt as to the jurisdiction of this court over the subject, and I have no hesitation whatever in exercising it. Under the circumstances, I deem it my duty to see to it that the assets of this trust in the hands of the institution are not inequitably administered. * * * The course now taken in regard to this institution is not without precedent in this court. In the case of Hoboken Bank for Savings (1874) like measures were taken by me under similar circumstances with salutary effect and most beneficial results to the depositors." In 1871 a similar proceeding for scaling down the deposits of a savings bank was taken in Connecticut. In that case a sum equal to 24 per cent. of the deposits then in the bank was scaled by the trustees themselves, and a joint resolution was subsequently passed by the legislature ratifying their action. Afterwards an action was brought by one of the depositors to recover the difference between his deposit and the amount to which it was scaled, and the supreme court, without giving any effect to the resolution of the legislature, held that the action of the trustees in thus scaling down the deposits was lawful and proper, and that the depositor could not recover. Like proceedings have been had in New Hampshire, where there is a statute authorizing them. In Massachusetts, in the case of *Lewis* v. *Lynn Inst. for Savings*, 148 Mass. 235, 19 N. E. Rep. 365, the rule laid down in the Connecticut case was approved and applied. At page 244, 148 Mass., and page 367, 19 N. E. Rep., the court says: "But to the depositors themselves the undertaking of the corporation is that it will receive and combine the deposits, and manage and use them to the best practical advantage, according to the judgment of the trustees, and give to the depositors, in just proportion among themselves, the benefit of the result of such management. There is no absolute promise to repay to any depositor the full amount of his deposit. Such a promise to one depositor would imply that in case of loss he should be repaid out of the deposits of others. The promise or undertaking of the corporation is the same to all. There is no promise to pay one at the expense of others. The promise is, in effect, to pay each depositor in full with his dividends, provided the assets are sufficient, and, if they are not sufficient, then to pay each one his proportionate share."

It seems, therefore, that the application now made is supported by the provisions of the statute above quoted, and by well-considered adjudications in this and other states. I think the power of the court is clear, and that the present presents a proper case for its exercise.