Chief Judge Breitel.
In this action representative commercial banks seek declaratory and injunctive relief against competing representative savings banks and the Superintendent of Banks. Plaintiff commercial banks challenge the legality under the State Banking Law of the so-called "NOW” (Negotiable Order of Withdrawal) account, a form of checking *434 account service offered by many savings banks under regulations of defendant Superintendent of Banks. Upon an agreed statement of facts submitted directly to the Appellate Division (CPLR 3222), judgment was unanimously rendered in favor of the commercial banks declaring that savings banks had no power to offer NOW accounts and that the superintendent’s regulations were null and void, and enjoining the savings banks from offering such accounts.
The issue is whether under the Banking Law, or otherwise, savings banks may offer to their customers so-called NOW accounts.
There should be an affirmance. Nothing in the Banking Law authorizes savings banks to provide checking account services. Indeed, the Legislature has repeatedly rejected proposed legislation to empower savings banks to offer checking account services. True, the Banking Law authorizes savings banks to provide passbook-less accounts and, by unquestioned practice, to permit depositors to make withdrawal orders payable to, or to the order of, third parties (§ 238, subd 6; § 234, subd 1). While the statutes may appear literally "unambiguous” on their face, the absence of ambiguity facially is never conclusive. Sound principles of statutory interpretation generally require examination of a statute’s legislative history and context to determine its meaning and scope.
The legislative history of the applicable statutes in context establishes that the Legislature did not intend to authorize savings banks to offer checking account services, a traditional function of commercial banks. Although now largely attenuated but still relevant, there have been public and banking policies separating the functions of commercial and savings banks. That savings banks ought to be permitted to offer checking account services, for which there is considerable local and national support, should be addressed to the Legislature and not to the courts.
The facts have been fully stated in the opinion by Mr. Justice Mahoney at the Appellate Division and therefore are restated only briefly.
Since 1974 New York savings banks have offered NOW accounts to their customers. A NOW account is a noninterest or nondividend bearing account in which the savings bank depositor, periodically and for that purpose, makes deposits against which the depositor draws negotiable drafts payable to a third party. No passbook is issued to the customer in *435 connection with the NOW account (for a discussion of NOW accounts see Comment, The Negotiable Order of Withdrawal [NOW] Account: "Checking Accounts” for Savings Banks?, 14 Boston Coll Ind & Comm L Rev 471).
Manifestly and unabashedly, the NOW account is intended to be the savings bank equivalent of a commercial bank checking account. Indeed, widespread advertising by the savings banks enlarges on the similarity between NOW accounts and commercial checking accounts. There is, however, a difference which might in unusual financial circumstances be significant. Unlike a check drawn on a commercial bank, which is unconditionally payable on demand, payment of a negotiable order of withdrawal, in form a draft payable on demand, may be delayed by a savings bank for 60 days (Banking Law, § 238, subd 2).
Negotiable orders of withdrawal are generally deposited for collection by the payee or transferee in his own bank, and are presented, through a commercial bank by arrangement with the drawee savings bank, to the drawee savings bank for payment. The savings bank then charges the depositor’s NOW account to pay the order. A monthly statement, much like a commercial bank’s checking account statement, is furnished to its NOW depositor by the savings bank.
Explicit detailed authorization for NOW accounts is found in the regulations of the Superintendent of Banking (3 NYCRR Part 301). Issued by the superintendent on May 29, 1974, these regulations govern the offering by savings institutions of "non-interest-bearing, no-pass book * * * 'NOW accounts’.” (3 NYCRR 301.1.) Among other things, the regulations prescribe operational and check-clearing details, regulate advertising of the NOW account service, and impose reserve requirements equal to those imposed with respect to demand deposit checking accounts.
The commercial banks challenge the legality of the savings banks’ NOW accounts and the validity of the superintendent’s regulations, for lack of statutory authorization. In the absence of such authorization, the commercial banks contend that the historical purposes of and the functional distinctions between savings banks and commercial banks, closely preserved by statute, foreclose the savings banks from providing NOW accounts.
Subdivision 1 of section 234 of the Banking Law empowers a savings bank to "receive and pay deposits” and to exercise the *436 incidental powers necessary to conduct its business. For many decades savings banks have permitted their depositors to make withdrawal orders payable to third parties or to bearer. The third party would, however, be required to present the depositor’s passbook to collect the amount of the order. There were some exceptions, but they do not merit treatment in this discussion.
In 1965, subdivision 6 of section 238 was added to the Banking Law (L 1965, ch 804, § 2). It provides: "Subject to any regulations and restrictions prescribed by the superintendent of banks, a savings bank may accept deposits without the issuance of a passbook in connection therewith, and may issue such other evidences of its obligation to repay such deposits as may be appropriate to safeguard the interests of the depositors and of the savings bank.”
With the passage of subdivision 6 of section 238, the savings banks reason, the passbook requirement was eliminated and hence they could, subject to the superintendent’s regulations, lawfully offer NOW accounts to their customers. Notably, the statutory change is hardly complete or embracive of its subject matter (compare the statute considered in Matter of Sigety v Hynes, 38 NY2d 260, and the standards of interpretation there applied).
It has been said often, but with less than meticulous analysis, that an "unambiguous” statute permits of no inquiry into legislative intention (see, e.g., McCluskey v Cromwell, 11 NY 593, 601; accord, e.g., Matter of Roosevelt Raceway v Monaghan, 9 NY2d 293, 304, app dsmd 368 US 12; see, generally, McKinney’s Cons Laws of NY, Book 1, Statutes, § 120). Absence of facial ambiguity is, however, rarely, if ever, conclusive. The words men use are never absolutely certain in meaning; the limitations of finite man and the even greater limitations of his language see to that. Inquiry into the meaning of statutes is never foreclosed at the threshold; what happens is that often the inquiry into intention results in the conclusion that either there is no ambiguity in the statute, or that for policy or other reasons the prior history will be rejected in favor of the purportedly explicit statement of the statute (see, e.g., Matter of Barton v Lavine, 38 NY2d 785). Then it is often said with more pious solemnity than accuracy, that the clarity of the statute precludes inquiry into the antecedent legislative history. As the Supreme Court stated in United States v American Trucking Assns. (310 US 534, 543- *437 544): "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole’ this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law’ which forbids its use, however clear the words may appear on 'superficial examination’. The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts’ conclusion as to legislative purpose will be unconsciously influenced by the judges’ own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion.” (See, e.g., Le Drugstore Etats Unis v New York State Bd. of Pharmacy, 33 NY2d 298, 302; Matter of Astman v Kelly, 2 NY2d 567, 572; McKinney’s Cons Laws of NY, Book 1, Statutes, § 111; 82 CJS, Statutes, § 322, at pp 588-590.)
Subdivision 6 of section 238 and subdivision 1 of section 234 do not directly empower savings banks to provide checking account services. They say nothing about checking accounts. Moreover, these statutes are not free from "ambiguity”, if read in context as any language must be. Indeed, as demonstrated at the Appellate Division, the weight of meaning the savings banks would have the statutes bear is much too heavy, if in fact so great an expansion of the powers of savings hanks had been contemplated. Only upon a literal and atomistic reading of the statutes, a reading blind to the legislative history antecedent to their enactment and even afterward, could one conclude that savings banks may offer checking account services. It was not, obviously, for lack of reading *438 understanding that the superintendent let the 1965 revision lie dormant for nine years before promulgating his 1974 NOW account regulations.
Looking beyond the literal words, the limited reasons for the 1965 revision to section 238 are made explicit in the legislative history, and they do not embrace authorization of checking accounts. Instead, the statute was added to authorize the use of nonpassbook savings accounts, but true savings accounts for the accumulation of reserves, thus permitting savings banks to take advantage of technological innovations in record keeping and to maintain a competitive position with commercial bank savings accounts (Banking Dept Memorandum of July 6, 1965 on Senate Intro No. 4143, Print No. 4651, at pp 2, 3, and ns; see Memorandum of Senator Bloom, 1965 NY State Legis Annual 154).
It is all but conclusive that the enactment of subdivision 6 of section 238 was not intended to authorize savings bank checking accounts. Not until the spring of 1974 was any effort made to use the 1965 legislation to develop the so-called NOW accounts, after failure to obtain explicit statutory authorization for checking accounts from the 1974 Legislature (Assembly Intro No. 12044, § 46). Indeed, express statutory authorization for savings bank checking accounts has been repeatedly refused by the Legislature (1973 Assembly Intro No. 1946; 1974 Senate Intro No. 7996 [NOW accounts]; 1971 Assembly Intro No. 3925; 1971 Senate Intro No. 3350; 1972 Senate Intro No. 9041; 1974 Assembly Intro No. 6889; 1974 Senate Intro No. 5374; 1975 Assembly Intro No. 6444-D; 1975 Assembly Intro No. 7324; 1975 Senate Intro No. 4050; 1975 Senate Intro No. 6252-A [demand deposit accounts]).
Recognizing the public policy issues in the controversy, candid assessment is indicated. There is no doubt that both commercial banks and savings banks (and the same could be . said about a number of classes of intermediate financial institutions) have changed markedly in function and operation from what they were in early and mid-nineteenth century (see Androscoggin County Sav. Bank v Campbell, 282 A2d 858, 861 [Me]; for an older view of the respective roles of savings and commercial banks see, e.g., Hun v Cary, 82 NY 65, 78; Rome Sav. Bank v Kramer, 32 Hun 270, 273, affd sub nom. Rome Sav. Bank v Krug, 102 NY 331; People v Ulster County Sav. Inst., 20 NYS 148, 150, affd 64 Hun 434, affd 133 NY 689; Matter of Wilkins, 131 Misc 188, 193-194; compare People v *439 Franklin Nat. Bank of Franklin Sq., 305 NY 453, 461, revd 347 US 373; see, also, 1937 Opns Atty Gen 304, 305-306; 1940 Opns Atty Gen 385, 386; Comment, NOW Accounts, 14 Boston Coll Ind & Comm L Rev 471, at pp 473-474).
The demarcations between savings and commercial banks have been progressively blurred with respect to their different standards of investment, liquidity, and required reserves, types of credit transactions they are authorized to provide, and the kinds of sources from which they draw their deposits. Each has progressively and competitively encroached upon the field of the other. Commercial banks now have savings accounts upon which they pay interest, with a differential in rate less significant as general and bank interest rates have risen. Savings banks issue and "sell” money orders, as distinguished from officers’ checks, payable to named payees, and charged against savings accounts. Both kinds of banks sell traveler’s checks; both provide safe deposit boxes for rental to nondepositors; both provide specialized savings accounts for fiduciaries and corporations; and the list could be extended still more. Particularly interesting in showing both the blurring of distinction and encroachment, in this instance by the commercial banks, are the combination checking and savings accounts currently being offered and widely advertised by the commercial banks which are almost identical to the NOW accounts offered by the savings banks. Of course, to begin with savings accounts in commercial banks were a gross competitive encroachment on thrift institutions.
Despite these competitive encroachments, and there are some who deplore them and some who applaud them, each encroachment has almost invariably been authorized by explicit legislation (see, e.g., L 1923, ch 669; L 1958, ch 238; L 1961, ch 164 [safe deposit boxes]; L 1938, ch 352, § 1 [traveler’s checks]). Presumably and certainly purportedly, the legislative grants of power to one kind of bank or the other have been influenced by strong policy considerations designed to assure availability of banking services, safety of funds entrusted to banks, and avoidance of competition so severe that it might undermine the safety of banks. Thus, it is a significant policy consideration whether savings banks, originally designed to keep and repay funds which are withdrawn from or move into circulation slowly, should have the kind of checking service which emphasizes volatile turnover of funds (see Report of the Superintendent’s Advisory Committee on Financial Reform, *440 1974, pp 28-32). Integrated into the classification of intermediate financial institutions are different standards of investment and reserves, ratios of deposits to - capital, and access to different kinds of central discounting banks. It is relevant but also probative of opposite conclusions on the issue at hand that the superintendent under his NOW account regulations requires the savings banks to maintain reserves comparable to those required of commercial banks for demand deposits.
The Superintendent of Banks and the banking board have broad powers of regulation to control and police the banking institutions under their supervision (Banking Law, §§ 12, 14, subd 1; § 238, subd 6). Those powers, however, are first defined in the statutes, and, it would seem, that unless the statutes make reasonably clear that the superintendent has power to authorize the several classes of institutions under his supervision to perform new or additional services, his powers of rule making do not go beyond the statute (cf. Banking Law, § 12, subd 3). It is at this point that the overly broad meaning which the savings banks would attach to the 1965 revision of section 238 fails of persuasion. Indeed, the power of the superintendent to make rules and regulations concerning passbook-less accounts was included in subdivision 6 "to prevent the misuse of non-passbook savings accounts for checking purposes” (Banking Dept Memorandum of July 6, 1965 on Senate Intro No. 4143, at p 4).
In saying what has been said, however, it does not mean that the court has any view, or if it did that it would be relevant, whether savings banks should have power to provide checking account services to its customers (cf. Montgomery v Daniels, 38 NY2d 41, 53). What has been said simply emphasizes that there are involved policy considerations which must be resolved by the Legislature, and that the particular policy issue was not resolved by the Legislature in the 1965 revision. The court is also aware that the policy issue is one in which competitors are at loggerheads, and that they have demonstrated capability of securing legislative redress, correction, clarification, or even innovation, explicitly and beyond cavil. Indeed, pending Federal legislation may forcefully suggest the path of resolution of the problem. The new legislation, already having passed the Senate, would allow Federally regulated savings banks and other thrift institutions to offer checking and NOW accounts (see New York Times, Dec. 12, 1975, p 1, col 6).
*441 For some time now the. savings banks throughout the State have been providing checking account services under the regulations adopted by the superintendent, and have advertised them extensively. Since these accounts have presumably been used widely by many customers of savings banks, it would be unduly disruptive to terminate these services abruptly. Hence, there should be a stay of enforcement of the determination in this action. Moreover, the Legislature will shortly meet in regular annual session, and if the superintendent and the savings banks be so advised, they may seek unequivocal legislation to accomplish what this court concludes they had mistakenly believed to be authorized in the 1965 revision.
Accordingly, the judgment of the Appellate Division should be affirmed, without costs, and enforcement stayed until March 31, 1976.
Judges Jasen, Jones, Wachtler, Fuchsberg and Cooke concur; Judge Gabrielli taking no part.
Judgment affirmed, etc.