OPINION OF THE COURT
Joan A. Madden, J.
In this declaratory judgment action, plaintiff Cable & Wireless, Inc. (Cable) moves for summary judgment seeking a declaration that under the Administrative Code of the City of New York during the tax periods from April 1, 1990 through March 31, 1996 it was “subject to the department of public service.” *411 Thus, Cable asserts, it should have paid taxes as a utility, not as a vendor of utility services, the classification under which it filed. As a utility is exempt from paying the General Corporation Tax (GC Tax), to which vendors of utility services are subject, Cable asserts it is entitled to a refund of its payments of the GC Tax with respect to those years.
The City opposes Cable’s motion and cross-moves for summary judgment seeking a declaration that under the Administrative Code for the tax periods in issue, Cable was a vendor of utility services, not a utility, that it properly paid the GC Tax for the subject tax years and is not entitled to a refund.
Cable is a “worldwide telecommunications firm that provides long-distance telecommunications services to business customers throughout the United States and * * * since 1984 has been authorized by the New York Public Service Commission to operate as a reseller of intrastate and interstate telephone services to the public in New York State.” (Letter dated Dec. 5, 1996 to NY City Dept of Fin from Coopers & Lybrand on behalf of Cable requesting refund of GC Tax in issue.) In 1995 Cable requested authorization to provide intracity services and in October of that year it was given such authorization. (Id.) Thus, for most of the relevant tax periods, Cable was not authorized to provide intracity services which, for the reasons discussed below, potentially has a significant impact on its tax liability.
“The resale of telephone services occurs when a firm orders services from a regulated supplier and repackages those services in a way that provides consumer benefits of pricing and/or additional service and feature availability.” (29 NY PSC 421, 433 [Op No. 89-12], 103 Pur 4th 1, Opinion and Order Concerning Regulatory Response to Competition [hereinafter 1989 PSC Opinion on Regulatory Policies].) A reseller exists due to the differential between wholesale and retail rates of facility-based carriers or because their services offer advantages not available from the wholesaler. (Reseller is defined in 1989 PSC Opinion on Regulatory Policies at [3] [4] [v] n 6.) While it is undisputed that, at present, resellers such as Cable are to a limited degree regulated by the Department of Public Service, what is disputed is whether its activities as a reseller are such that, for City Utility Tax (Utility Tax) purposes, it is a utility within the meaning of the Administrative Code.
The Utility Tax draws a distinction between utilities, defined as “[e]very person subject to the supervision of the department of public service” (Administrative Code § 11-1101 [6]) and vendors of utility services, who are defined as “[e]very person *412 not subject to the supervision of the department of public service who furnishes or sells * * * telecommunications services” (Administrative Code § 11-1101 [7]).
Utilities are taxed on their gross income which includes any sale of services, real property, securities, etc. (see, Administrative Code § 11-1101 [4]). On the other hand, vendors of utility services are taxed on gross operating income, which is limited to income related to the furnishing of utility services (Administrative Code § 11-1101 [5]). As the tax on gross income imposed on utilities is generally a broader tax base than the gross operating income on which vendors of utility services are taxed, under the taxing scheme in the Administrative Code, utilities are exempt from the GC Tax which vendors are required to pay. (See, Administrative Code § 11-603 [1], [4] [a].)[1]
During the tax periods in issue, Cable filed as a vendor of utility services and seeks a refund of the $1,675,730 it paid in GC Tax. It is undisputed, if taxed as a utility, Cable’s taxes for the subject periods would be negligible, as the City’s tax on utilities is assessed only on intracity transactions, that is, transactions which originate and are consummated in the City[2] (see, General City Law § 20-b). Cable was authorized to provide intercity and interstate telephone services in New York in 1984, and was not authorized to sell intracity services until October 1995. Therefore, for five years and seven months of the six tax years in issue, Cable did not sell intracity services, and had few such taxable transactions.
As “subject to the supervision of the department of public service” is not further defined by statute, the interpretation of this provision within the scheme of the Utility and GC Taxes is the central issue in this action.
The Department of Public Service is a part of state government (Public Service Law § 3), and within it the Public Service Commission (PSC) is authorized with the powers and duties, including those of supervision, to carry out the purposes of the Department (Public Service Law §§ 4, 5). The PSC has general *413 supervision of all telephone corporations (Public Service Law § 5 [1] [d]), which includes every corporation “owning, operating or managing any telephone line or part of telephone line used in the conduct of the business of affording telephonic communication for hire” (Public Service Law § 2 [17]).
Cable argues that as the PSC has general supervision of all telephone corporations (Public Service Law § 94 [2]), and as it is undisputed that it is a “telephone corporation,” that it is subject to the supervision of the Department of Public Service. In support of its position, Cable points to related Public Service Law provisions requiring it as a telephone corporation to obtain a certificate of public convenience and necessity from the PSC before offering telecommunication services, as well as requiring PSC approval of its rates (see, Public Service Law § 92 [2]), and its issuance of debt and securities (see, Public Service Law § 101). Furthermore, Cable asserts that the PSC has the power to audit its management and operations (see, Public Service Law § 96), and to direct it to implement any reasonable recommendations arising from such an audit (id.).
The City argues that Public Service Law § 94 (2) only establishes that a telephone corporation such as Cable is subject to the jurisdiction of the PSC, not its supervision, and that the PSC exercises regulatory, not supervisory, control as to Cable. As evidence of the lack of supervision, the City relies, in part, on the pro forma nature of the PSC response to Cable’s applications regarding its rate schedules and capital structure, and its relaxation and lack of enforcement of the requirements of other Public Service Law provisions.[3]
Additionally, the City maintains that even if it was assumed that Cable was subject to the supervision of the PSC, there was no meaningful level of supervision which would establish Cable as a supervised utility entitled to an exemption from the GC Tax. The City further argues that historically for Utility Tax purposes, supervised utilities have been monopolies, and since monopolies provide essential services, the public interest is implicated, and thus, intense supervision is required. This supervision includes the provisions regarding rate setting and approval of decisions relating to its financial condition, including its capital structure and issuance of stocks, bonds and other evidences of debt. As a supervised utility is taxed on its gross *414 income, such supervision, the City asserts, insures that a supervised utility receives a fair rate of return and that it remains financially healthy to insure uninterrupted service to the public. Thus, the City argues these considerations do not apply to a business such as Cable, which, as a reseller of telecommunication services, operates in a competitive, unrestricted environment where the public interest is not implicated.
In response, Cable argues that such an interpretation of Administrative Code § 11-1101 (6) changes the language from “subject to the supervision of the department of public service” to “subjected to,” that the statute does not contain any language requiring “meaningful supervision,” and that, in any event, the PSC did, in fact, supervise Cable.
Finally, Cable argues that as a statute which levies a tax, the Utility Tax must be construed most strongly against the City. The City contends that the rule is otherwise where the taxpayer claims an exclusion, as Cable claims from the GC Tax, in which instance the presumption is in favor of the taxing authority.
As noted above, this issue involves the interpretation of the provision “subject to the supervision of the department of public service,” and thus, principles of statutory construction apply.
“The primary consideration of courts in interpreting a statute is to ‘ascertain and give effect to the intention of the Legislature’ (McKinney’s Cons Laws of NY, Book 1, Statutes § 92 [a], at 177). Of course, the words of the statute are the best evidence of the Legislature’s intent. As a general rule, unambiguous language of a statute is alone determinative (see, Matter of Washington Post Co. v New York State Ins. Dept., 61 NY2d 557, 565). Nevertheless the legislative history of an enactment may also be relevant and ‘is not to be ignored, even if words be clear’ (McKinney’s Cons Laws of NY, Book 1, Statutes § 124, at 252). ‘When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no “rule of law” which forbids its use, however clear the words may appear on “superficial examination” ’ (New York State Bankers Assn. v Albright, 38 NY2d 430, 437). Pertinent also are ‘the history of the times, the circumstances surrounding the statute’s passage, and * * * attempted amendments’ (McKin *415 ney’s Cons Laws of NY, Book 1, Statutes § 124, at 253). Varying concerns may bear on the weight to be given legislative history (see generally, Abner J. Mikva and Eric Lane, An Introduction to Statutory Interpretation and the Legislative Process, at 27-41 [1997]), but they do not justify abandoning this Court’s long tradition of using all available interpretive tools to ascertain the meaning of a statute.” (Riley v County of Broome, 95 NY2d 455, 463 [2000].)
While it can be argued that the words “subject to the supervision of the [PSC]” are clear, nonetheless, based on the foregoing principles, it is appropriate to examine the legislative intent and history, amendments, and the circumstances under which the tax was enacted. This is especially so, where changes in an industry, as in the telecommunications industry which occurred herein, could not have been envisioned at the time the statute was enacted.
The City Utility Tax was created by Local Law No. 19 (1933) of the City of New York as an emergency measure to combat the hardship of Depression-era unemployment by imposing, “an excise tax on the gross incomes of each and every corporation * * * operating within such city and subject to the supervision of* * * the public service commission.” (Local Law No. 19 [1933], reprinted in Ash’s Annotated Greater New York City Charter, at 793 [5th ed 1936].)
The 1933 Utility Tax imposed the tax on gross income only on utilities subject to the supervision of the PSC. As this did not cover all businesses which provided utility services, amendments in 1934 and 1935 extended the tax to cover those engaged in the business of furnishing or selling gas, electric, steam, water, telephone or telegraph service whether or not subject to the supervision by the Department of Public Service. (Matter of 320 W. 37th St. v McGoldrick, 281 NY 132, 136 [1939].) While the 1934 statute imposed the tax on gross income without distinguishing between those businesses subject to the supervision of the Department of Public Service and those not subject to such supervision, the 1935 amendment provided that those businesses not subject to the Department of Public Service were to be taxed on gross operating income. (Local Law No. 2 [1935] of City of New York, reprinted in Ash’s Annotated Greater New York City Charter [5th ed 1936].)
The statute was again amended in 1940 after the Court of Appeals held that the tax was intended to apply to “those *416 engaged publicly in the business of distributing the named commodities or furnishing the named services” and therefore did not apply to businesses such as the real estate holding company in issue which sold electricity to its tenants and therefore was not subject to the tax. (Matter of 20 W. 37th St., 281 NY 132, 138 [1939].)
The 1940 amendment created the “category of* * * Vendors of utility services’ * * * defined * * * as anyone who, though not subject to the supervision of the department of public service, furnishes or sells electricity, gas, etc., ‘regardless of whether such furnishing, selling or operation constitutes the main activity of such person or is merely incidental thereto.’ ” (436 W. 34th St. Corp. v McGoldrick, 288 NY 346, 348-349 [1942].) In upholding the tax on vendors of utility services the Court stated that “[t]here cannot, of course, be any doubt that this Local Law, as so amended in 1940, was intended to cover everyone selling or reselling electric current” and therefore the tax was properly imposed on a landlord’s receipts from submetering electricity to tenants. (Id. at 349.) In its opinion, the Court noted that unlike the tax on the gross receipts of public utilities, the tax on vendors of utility services was limited to its receipts from its submetering activities.
The foregoing amendments delineate the derivation of the two classifications subject to the utility tax and of their respective tax bases, and are rooted in the historical rationale for imposing the tax on utilities. As stated by the Court of Appeals in its opinion upholding the constitutionality of the Utility Tax, utilities which are “subject to supervision by the Public Service Commission — that, because of the public service nature of their respective businesses, are accorded a degree of protection against competition and other advantages over the general business community. This common character of the group is, we think, a valid basis of classification for the purposes of this tax [the utility tax on gross income]” (New York Steam Corp. v City of New York, 268 NY 137, 147 [1935]).
In exchange for the advantages and protections afforded utilities, such as access to right of way and monopoly power to operate within a defined service area, a utility’s rates, capital structure, and terms of service are regulated. (Hellerstein & Levine, Utility Gross Receipts Taxes and Interexchange Telecommunications Carriers, 40 Tax Notes 529, 530 [Aug. 1, 1988]; see also, 436 W. 34th St. Corp. v McGoldrick, supra; Matter of United Parcel Serv. v Joseph, 272 App Div 194, 199 [1st Dept], affd 297 NY 1004 [1948] [where the Court stated *417 that “New York City utilities enjoying special privileges from New York City are required to pay the high rate of tax on the gross income earned here through the exercise of special privileges”].)
In 1933, at the time of the enactment of the Utility Tax, and at the time of the relevant amendments, utilities subject to the supervision of the PSC were monopolies, such as Consolidated Edison, New York Telephone and Brooklyn Union Gas, and provided services or commodities viewed as necessities, that is, electricity, telephone, gas, water, etc., to the public without discrimination. Telephone service was “a comprehensively franchised and regulated monopoly * * * [and] the business of telephonic communication was the almost exclusive domain of the Bell System.” (NY Pub Serv Commn, Proceeding on Motion of the Commission to Review Regulatory Policies for Segments of the Telecommunications Industry Subject to Competition, 1988 NY PUC LEXIS 24, *6 [Case 29469, May 9, 1988] [hereinafter 1988 PSC Opinion on Regulatory Policies].)
However, “[s]ince 1969, the telephone industry has been restructured by a series of FCC rulings and the settlement of a Federal antitrust action against the Bell System Companies.” (AT&T Info. Sys. v City of New York, 137 AD2d 7, 10 [1st Dept 1988].) With respect to the telecommunications industry, revolutionary changes have transformed the industry so that little of the environment that existed in 1933 when the Utility Tax was enacted is present today. (See Utility Gross Receipts Taxes at 530.) The revolutionary changes have encompassed the emergence of a competitive environment and have fostered an examination by the PSC of the nature of the market and of the regulatory structure in New York. (1989 PSC Opinion on Regulatory Policies at 2, 3; 1988 PSC Opinion on Regulatory Policies at 1, 2, 3.) As to resellers such as Cable, the PSC has concluded that as “resale activity tends to exhibit the characteristics of effective competition * * * [and as] [t]here are no significant, effective barriers to entry and resellers generally do not have the ability to control prices or exercise market power,” regulation has little role to play. (29 NY PSC 421, 434.)
Thus, the PSC has given Cable’s applications for approval for a flexible rate schedule and to issue stock and other securities pro forma consideration, as evidenced by the lack of public hearings, of any in-depth analysis and of any investigation by the PSC. Based on the foregoing, during the relevant tax periods, PSC’s regulation of Cable has been minimal and is not comparable to what one court has referred to as the previous *418 “pervasive regulation” by the PSC over entities subject to its supervision. (AT&T Info. Sys. v City of New York, supra at 13.)
While a taxing statute must be construed against the taxing entity and in favor of the taxpayer (Matter of Koner v Procaccino, 39 NY2d 258, 264 [1976]), it is also true that a statute speaks as of the time it took effect, not as of the time the courts are called on to interpret it (McKinney’s Cons Laws of NY, Book 1, Statutes § 93; Matter of Spencer v Board of Educ., 39 AD2d 399 [3d Dept], affd 31 NY2d 810 [1972] [age requirement for office, which referred to a “qualified voter,” held to be 21 the voting age at the time of enactment, even though Twenty-Sixth Amendment subsequently lowered the voting age to 18]). Thus, construing the statute against the City, based on the amendments, the history of the times in which it was enacted together with the legislative history, this court finds that in using the words “subject to the supervision of the [PSC],” the City Council did not envision imposing the Utility Tax on gross income on entities such as Cable which exhibit none of the characteristics of the monopolies to which the tax was intended to apply.
While Cable provides telecommunications services, it is a reseller of such services and unlike monopolies does not have an exclusive right to provide services in a defined area, but rather operates in a competitive environment so that customers have access to other providers. Furthermore, while Cable is required to file its rates, and obtain approval for the issuance of stock and debt, during the relevant periods, there was no formal public hearing or intense scrutiny or investigation of either its rates or capital structure as required when supervised utilities seek such approval.
It is also significant that Cable’s rates are flexible within a range, and can be adjusted with one day’s notice, enabling Cable to act quickly to changes in the marketplace. Finally, absent from the circumstances in which Cable operates is a guarantee of a fair rate of return characteristic of supervised utilities and, due to the competitive market, there is no public interest in ensuring that Cable continues to provide uninterrupted service.
For the foregoing reasons, it is evident that the City Council did not intend the Utility Tax on gross income to apply to an entity such as Cable which operates in a competitive environment where market forces shape its rates, capital structure and corporate decisions. Thus, in interpreting the meaning of “subject to the supervision of the department of public service” *419 for Utility Tax purposes, this court declines to give the literal construction to this language urged by Cable, when to do so would produce an unjust result not intended by the City Council. (United Parcel Serv. v Joseph, supra.) To hold otherwise would be to frustrate the purpose of the Utility Tax, and have the unintended effect of subjecting Cable and other similarly situated entities to a tax on gross income. (See Matter of American Communication Tech. v State of New York, 185 AD2d 79, 82 [3d Dept 1993].)
The legislative history of the GC Tax and the interrelationship between it and the Utility Tax supports this result. Under the Administrative Code in effect in 1966, the City of New York taxed businesses on their gross income (Administrative Code former § B46-2.0 [1963]). In 1966, the GC Tax was enacted which changed the tax so that it was assessed on “net” income. The purpose of the change was to restructure the business tax scheme so that corporations with high profit margins would bear a larger proportionate share of the tax burden (Mem of City of NY, 1966 NY Legis Ann, at 295). Therefore, in switching to a net income tax for corporations generally, the City Council intended that competitive entities should be taxed on net income, recognizing the tax burdens of an assessment based on gross income for entities which operated in a competitive market.
As noted above, these concerns did not apply then (or now) to supervised utilities, which retain characteristics of a monopoly and, through regulation of their rates, are assured a reasonable rate of return and can withstand a tax on gross income. For these reasons, under the taxing scheme, a supervised utility, while exempt from the GC Tax, is subject to a tax on gross income imposed under the Utility Tax. As Cable operates in a competitive environment, subjecting it to the GC Tax on net income is consistent with the purpose of the tax and the intent of the City Council.[4]
Furthermore, Cable has the burden of proving that it is a supervised utility, and thus, exempt from the GC Tax. (Matter of Colt Indus. v New York City Dept. of Fin., 66 NY2d 466, 469 [1985].) For the foregoing reasons, based on the legislative intent and history of the GC Tax, when considered in light of the history of the times in which it was enacted and the taxing schemes in issue including the interrelationship between the *420 Utility Tax and GC Tax, Cable has failed to meet its burden of proving that it is exempt.
Accordingly, it is hereby ordered that plaintiffs motion for summary judgment is denied, and it is further ordered that defendants’ cross motion for summary judgment is granted, and it is further ordered, adjudged and declared that for the tax periods April 1, 1990 through March 31, 1996 Cable & Wireless properly filed taxes as a vendor of utility services under the Administrative Code and is not entitled to a refund of the General Corporation Tax it paid for such tax periods.
[Portions of opinion omitted for purposes of publication.]

. Under the taxing scheme, in assessing the GC Tax, a vendor of utility services’ net income may be reduced by the percentage equal to the ratio of its gross operating income subject to the Utility Tax to its total gross operating income (Administrative Code § 11-603 [4] [a]).

. This limitation is rooted in the requirement that “[w]hen a State or municipality seeks to impose an income-based tax upon a multijurisdictional corporation the strictures of the Due Process and Commerce Clauses compel it to confine its taxing powers to income fairly attributable to activities carried on within its borders.” (Matter of Allied Signal v Commissioner of Fin., 79 NY2d 73, 79 [1991] [citations omitted].)

. See, NY Pub Serv Commn, Proceeding on Motion of the Commission to Consider the Applicability of Public Service Law Provisions to Competitive Entities, Case 99-M-1722, 1999 WL 1455005, Dec. 17, 1999 (hereinafter 1999 PSC Opinion on Competitive Entities).

. As indicated in footnote 1, a vendor of utility services’ Utility Tax is factored into its GC Tax assessment.