[841 NYS2d 72]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v WAYNE
RICE, Respondent.

First Department, August 23, 2007

## APPEARANCES OF COUNSEL

*Robert M. Morgenthau, District Attorney*, New York City (*Patricia Stolfi* and *Patrick J. Hynes* of counsel), for appellant.

*Law Office of Luis Diaz*, New York City (*Donald Yannella* of counsel), for respondent.

## OPINION OF THE COURT

NARDELLI, J.P.

In this People's appeal, we are asked to determine whether the suppression court properly granted defendant's motion to suppress physical evidence on the ground that the stop of defendant's vehicle was unauthorized pursuant to Vehicle and Traffic Law § 1163, which, the court held, does not require the operator of a motor vehicle to signal every lane change.

Testimony educed at a suppression hearing held on September 7, 2005 reveals that at approximately 9:30 P.M. on February 10, 2005, New York City Police Officers Brennan and Hoffman were on routine patrol, in uniform, in an unmarked police car. Officer Hoffman was driving north on Amsterdam Avenue, in the vicinity of West 153rd Street, when he observed a silver Mazda, also proceeding north on Amsterdam Avenue, move from the left lane to the right lane without signaling. Officer Hoffman ran the vehicle's license plate number, learned it was a rental car, which had not been reported stolen, and then witnessed the Mazda move from the right lane of Amsterdam Avenue back into the left lane, again without signaling. Officer Hoffman, at that point, activated his emergency lights and pulled the vehicle over.

The officers exited their car; Officer Hoffman approached the driver's side of the Mazda while Officer Brennan approached the passenger side. Hoffman requested the driver produce his license and the vehicle's registration and, in response, the driver, defendant Wayne Rice, presented a valid New York State driver's license in his name. Defendant then fumbled around in the glove compartment before handing the officer a rental agreement in the name of Sylena Cole. Hoffman remarked to defendant that the agreement was in a woman's name, prompting defendant to search the glove compartment a second time, resulting in the production of another rental agreement in defendant's name. Officer Hoffman testified that defendant was

acting nervous and offered no explanation for the duplicate agreements.

Officer Hoffman, upon examining the agreements, noted that most of the information on them, except the drivers' names, was identical, including dates, account number and invoice number. Hoffman further observed that the rental agreement in Sylena Cole's name was handwritten in places, whereas the agreement in defendant's name was typed or computer-generated, and that the car had been due back to the rental company two days prior to the stop. Hoffman, an experienced officer with approximately 400 arrests, and a trained member of the Narcotics Enforcement Unit, testified that although the computer check revealed the vehicle was not stolen, such information was not conclusive since he had been involved in many cases where a vehicle was stolen from a rental company lot and the theft was not discovered and reported for one or two weeks.

Hoffman, accordingly, believed something was wrong with the agreements and questioned defendant as to why there were two identical agreements in different names, but defendant again did not offer an explanation. Hoffman then asked defendant what he was doing in the area, to which he responded that he had come there to get a haircut, although upon further questioning, he did not know the name or location of the place where he intended to get a haircut, or how long he had been in the area. Officer Hoffman subsequently inquired if defendant had any weapons on him and, after defendant responded in the negative, the officer asked him to step out of the vehicle. As defendant complied, the officer noticed a knife clipped and hanging from defendant's left pants pocket. Hoffman grabbed the knife, a folding knife with a four-inch blade, possession of which is a violation of Administrative Code of the City of NY § 10-133.[1]

---

1. Administrative Code § 10-133 (b) provides that "[i]t shall be unlawful for any person to carry on his or her person or have in such person's possession, in any public place, street, or park any knife which has a blade length of four inches or more." Section 10-133 (c) provides that "[i]t shall be unlawful for any person in a public place, street or park, to wear outside of his or her clothing or carry in open view any knife with an exposed or unexposed blade unless such person is actually using such knife for a lawful purpose as set forth in subdivision d of this section." Subdivision (d) exceptions include possession by Boy Scouts and possession by a person when it is being used for or transported immediately to or from a place where it is used for hunting, fishing, camping, hiking, picnicking or any employment, trade or occupation customarily requiring the use of such knife. A violation of this section is punishable by a $300 fine and up to 15 days in prison.

Officer Hoffman then proceeded to frisk defendant to ensure that he did not have another weapon, and discovered an abnormal, unnatural bulge in defendant's groin area. Hoffman asked defendant if he had anything on him, to which defendant replied in the negative. Hoffman checked the groin area again, and defendant stated that it was his "balls," and then started yelling that Hoffman was hurting him and that the officer was touching his private parts. Hoffman testified that he knew from his training, as well as his experience, that rental cars are often used to transport narcotics and that the contraband is often transported in the groin area as if it were part of the human anatomy. Hoffman, due to suspicions concerning the two rental agreements and defendant's possession of the knife, arrested defendant and brought him to the precinct. Once at the precinct, the officer recovered $1,849 from defendant's person and, after again feeling the unnatural bulge in defendant's groin area, took defendant to a private room, and directed him to remove his pants and underwear. After defendant complied, Officer Brennan recovered a clear plastic package the size of a tennis ball containing cocaine, which had been wrapped inside defendant's underwear.

Defendant presented no evidence at the suppression hearing and, after argument by counsel, the hearing court issued a decision, dated February 2, 2006, granting defendant's motion to suppress the physical evidence on the ground that the traffic stop was unlawful. The hearing court credited the testimony of Officer Hoffman, including his observation of defendant's vehicle changing lanes on two occasions without using a signal. The hearing court concluded, however, that while the Vehicle and Traffic Law requires the use of directional signals on all occasions when a turn (a change of direction) is made, it does not require signaling when a lane change can be made in complete safety without such a signal. Accordingly, the hearing court found that the automobile stop in this case violated defendant's Fourth Amendment and New York State constitutional right to be free of unreasonable searches and seizures, thereby compelling suppression of the fruits of that unlawful stop. We disagree and reverse.

Vehicle and Traffic Law § 1163, entitled "Turning movements and required signals," provides, in pertinent part:

"(a) No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in section eleven hundred

sixty,[2] or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. *No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided.* . . .

"(d) The signals provided for in section eleven hundred sixty-four[3] shall be used to indicate an intention to turn, change lanes, or start from a parked position and not be flashed on one side only on a parked or disabled vehicle, or flashed as a courtesy or 'do pass' signal to operators of other vehicles approaching from the rear." (Emphasis added.)

Our analysis begins with the well-settled proposition that in matters of statutory interpretation, the courts are obligated to construe an enactment so as to effectuate the intent of the Legislature (*Long v State of New York*, 7 NY3d 269, 273 [2006]; *Flores v Lower E. Side Serv. Ctr., Inc.*, 4 NY3d 363, 367 [2005]; McKinney's Cons Laws of NY, Book 1, Statutes § 92). Moreover, "[a]s the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]; *Matter of Jansen Ct. Homeowners Assn. v City of New York*, 17 AD3d 588, 589 [2005]).

Vehicle and Traffic Law § 1163 (a) consists of two sentences: the first defines the "turning movements" governed by the statute as: turning a vehicle at an intersection; turning to enter a private road or driveway; otherwise turning a vehicle from a direct course upon a roadway; and moving right or left upon a roadway. The second sentence imposes a duty to use the required signals, stating: "[n]o person *shall so turn* any vehicle without giving an appropriate signal in the manner hereinafter provided" (emphasis added). It is clear from the foregoing that the word "so," in this context, is a plain reference to the four movements described in the first sentence of that subdivision.

Moreover, Vehicle and Traffic Law § 1163 (d) unequivocally requires that a turn signal *"shall be used* to indicate an inten-

---

**2.** Vehicle and Traffic Law § 1160 describes the proper starting position for a right hand turn, a left hand turn on a two-way roadway, a left hand turn on other than a two-way roadway, a specially regulated turn, and a U-turn.

**3.** Vehicle and Traffic Law § 1164 provides, inter alia, that a turn signal is to be given by means of either the hand and arm or signal lamps.

tion to . . . change lanes" (emphasis added). While the Legislature's employment of mandatory language, such as "shall" or "must," is not, by itself, conclusive, "such a word of command is ordinarily construed as peremptory in the absence of circumstances suggesting a contrary legislative intent" (*People v Schonfeld*, 74 NY2d 324, 328 [1989]; *Matter of Janus Petroleum v New York State Tax Appeals Trib.*, 180 AD2d 53, 54 [1992]). Here, not only is there an absence of any contrary intent, but the absence of any such qualification or limitation is consistent with the wording of section 1163 (a), which imposes a duty to signal a lane change under all circumstances. Indeed, if a duty to signal a lane change existed only under certain circumstances, as found by the hearing court, then a harmonizing reference to such a limitation would have been included in section 1163 (d).

To further expound on the foregoing, it has been observed that a valuable guidepost is discerning the intent of the Legislature in enacting a statute is the history of the times, as well as the events and circumstances associated with, and leading to, the passage of the statute (*Riley v County of Broome*, 95 NY2d 455, 464 [2000]; *Matter of City of New York v State of New York*, 282 AD2d 134, 142 [2001], *affd* 98 NY2d 740 [2002]; McKinney's Cons Laws of NY, Book 1, Statutes § 124).

A review of the legislative bill jacket (Bill Jacket, L 1964, ch 653) reveals that Vehicle and Traffic Law § 1163 was amended in order "to make the rules of the road provisions in such law consistent with the latest revised version of the Uniform Vehicle Code."[4] The bill was designed, inter alia, to:

> "remove[ ] the provision which presently states that directional signals need be used only when other traffic can be affected. This rule was impractical because it was sometimes difficult for a motorist to determine whether other traffic, including pedestrians, could be affected by his signals. *The amended statute places the absolute duty upon the person to use the signals when preparing to make a turn or when making one of the other movements covered by this statute*" (Letter from Dept of Motor Vehs, Bill Jacket at 6 [emphasis added]).

---

4. "The Uniform Vehicle Code is a model code drawn with the cooperation of the International Association of Chiefs of Police and the American Bar Association and others to provide for a uniform system of traffic regulation throughout the United States" (Mem of NY State Police, Bill Jacket at 11).

In view of the clear language of the statute, coupled with its unequivocal legislative history, we can only conclude that the hearing court erred when it determined that Vehicle and Traffic Law § 1163 does not require a signal, in all instances, when changing a lane.

To the extent that the concurring Justice urges caution with regard to our reference to memoranda[5] contained in the Bill Jacket, we would point out that our review of the legislative history was utilized to buttress a conclusion that, in our view, was clear from a reading of the plain language of the statute. This analytical approach is looked upon with favor by the Court of Appeals. "In the prevailing view of the Court of Appeals, the duty of the courts in statutory interpretation is to determine the legislative intent through examination of all available legitimate sources" (*People v Aarons*, 305 AD2d 45, 53 [2003], *affd* 2 NY3d 547 [2004]; *see also Matter of Sutka v Conners*, 73 NY2d 395, 403 [1989]).

Chief Judge Breitel, in *New York State Bankers Assn. v Albright* (38 NY2d 430, 436 [1975]), instructed that the "[a]bsence of facial ambiguity is, however, rarely, if ever, conclusive. The words men use are never absolutely certain in meaning; the limitations of finite man and the even greater limitations of his language see to that. Inquiry into the meaning of statutes is never foreclosed at the threshold." Judge Breitel, in quoting *United States v American Trucking Assns., Inc.* (310 US 534, 543-544 [1940]), added that "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination' " (*id.* at 437; *see also Riley*, 95 NY2d at 463-464 [2000]; *Matter of ATM One v Landaverde*, 2 NY3d 472, 476-477 [2004] ["(i)n matters of statutory and regulatory interpretation, we have repeatedly recognized that 'legislative intent is the great and controlling principle, and the proper judicial function is to discern and apply the will of the (enactors). Generally, inquiry must be made of the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history' (*Mowczan v Bacon*, 92 NY2d 281, 285 [1998]. . .)"]).

The views which we quote are part of a letter, authored by the Counsel of the New York State Department of Motor

---

5. It is unclear about what relevance the concurring opinion's reference to "floor debates" has to this matter.

Vehicles, and addressed to then Governor Nelson A. Rockefeller, requesting executive approval. We harbor no doubt that the Department of Motor Vehicles has a great deal of expertise in this area. Indeed, a memorandum from the New York State Senate Committee on Motor Vehicles and Transportation, in urging approval of the bill, employs much of the same language as that contained in the letter from Counsel of the Department of Motor Vehicles. Moreover, the Governor was also urged to approve the bill by, among others, the State of New York Office for Local Government, the New York State Police, and the New York State Association of Police Chiefs. The Bill Jacket contains no requests that the Governor reject the bill, and no memoranda discordant with the views expressed by the Department of Motor Vehicles and the Senate Committee on Motor Vehicles and Transportation.

Accordingly, the order of the Supreme Court, New York County (James A. Yates, J.), entered on or about February 2, 2006, which granted defendant's motion to suppress physical evidence, should be reversed, on the law, the motion denied, and the matter remanded for further proceedings.

McGUIRE, J. (concurring). Although I otherwise agree with Justice Nardelli's opinion, I would not place any stock in the letter relating to the 1964 enactment from which he quotes. This postenactment letter of the New York State Department of Motor Vehicles (DMV) states only the views of an affected executive agency about the proper interpretation of the statutory text. The Court of Appeals has cautioned that statements about the meaning or effect of an enactment by legislators during floor debates are "indicators of legislative intent [that] must be cautiously used (*see, Woollcott v Shubert*, 217 NY 212, 221 ['statements and opinions of legislators uttered in the debates are not competent aids to the court in ascertaining the meaning of statutes'])" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 586 [1998]). We should be even more circumspect about using the postenactment views of the Department of Motor Vehicles. Because the majority states that the relevance of this reference to floor debates is unclear, I will restate it: regardless of whether statements about the meaning of an enactment by the legislators who debated and voted on it must be used cautiously or are not even competent aids in determining its meaning, statements about the meaning of an enactment by persons who are not part of the enactment process must be less significant. Finally, this appeal turns on the meaning of the

phrase "so turn" in Vehicle and Traffic Law § 1163 (a). That is a pure question of law, a garden-variety issue of statutory interpretation, with respect to which the "great deal of expertise" that the DMV Commissioner possesses is irrelevant (*see Matter of Gruber [New York City Dept. of Personnel—Sweeney]*, 89 NY2d 225, 231-232 [1996]).

WILLIAMS, BUCKLEY and CATTERSON, JJ., concur with NARDELLI, J.P.; McGUIRE, J., concurs in a separate opinion.

Order, Supreme Court, New York County, entered on or about February 2, 2006, reversed, on the law, defendant's motion to suppress physical evidence denied, and the matter remanded for further proceedings.